CORPORACION VENEZOLANA de FOMENTO, Plaintiff,

v.

VINTERO SALES CORPORATION, Vintero Corporation, the Merban Corp., Security Pacific International Bank, Vincent A. De Lyra, Robert J. Redmond and James E. Himoff, Defendants.

CANADIAN IMPERIAL BANK OF COMMERCE, the Royal Bank of Canada International Limited, Banque Canadienne Nationale, Banque Provincial, LaSalle National Bank and American Security and Trust Company, Intervening Defendants,

v.

VENEZOLANA de CRUCEROS del CARIBE, C.A., Additional Defendant on the Counterclaim by Intervening Defendants,

and

Merban International, Incorporated, Additional Defendant on the Second Cross-Claim by Intervening Defendants.

No. 76 Civ. 1671 (WCC).

United States District Court, S. D. New York.

April 14, 1978.

Burns, Jackson, Miller, Summit & Jacoby, McHugh, Heckman, Smith & Leonard, New York City, for plaintiff; Jay H. Schafrann, Stuart G. Schwartz, Martin J. McHugh, New York City, of counsel.

Paskus, Gordon & Hyman, White & Case, New York City, for defendants, The Merban Corp., Robert J. Redmond and James E. Himoff; Robert R. Slaughter, David Hartfield, Jr., Allan L. Gropper, Patti R. Page, New York City, of counsel.

Baker & McKenzie, New York City, for intervening defendants, American Security Bank, N.A. (formerly American Security and Trust Company) and LaSalle National Bank; Lawrence W. Newman, New York City, of counsel.

Shearman & Sterling, New York City, for intervening defendants, Canadian Imperial Bank of Commerce, The Royal Bank of Canada International Limited, Banque Canadienne Nationale, Banque Provinciale; George J. Wade, Richard F. Russell, Francisca A. Sabadie, New York City, of counsel.

## MEMORANDUM AND ORDER

CONNER, District Judge.

Plaintiff in this diversity action seeks a declaratory judgment that its guarantees of two multi-million dollar loans are null and void and rescission of the guarantees and of the underlying loan agreements. The party which financed the loans and several Canadian and American banks which purchased interests in the promissory notes issued in connection therewith assert that the loans are in default and have counterclaimed for the award of principal and interest said to be owing from the guarantor.[1] Presently before the Court are the motions of defendants Merban, Redmond and Himoff and those of the intervening defendants for summary judgment dismissing the complaint and holding plaintiff liable on the notes.

---

1. At the time this action was brought, there was not a justiciable controversy since the obligor had not yet defaulted on the promissory notes. The counterclaims which have been asserted by defendant Merban Corporation, however, were justiciable when filed and remain so at the present time. Since they have an independent basis of federal jurisdiction (diversity of citizenship), they would properly be before this Court irrespective of the fate of the main claim. *National Research Bureau, Inc. v. Bartholomew,* 482 F.2d 386 (3d Cir. 1973); 6 C. Wright & A. Miller, Federal Practice and Procedure § 1414 at 80 (1971). The Canadian and American banks intervened as of right pursuant to Rule 24(a), F.R.Civ.P. Their counterclaims are ancillary to the claims asserted by Merban and therefore do not require an independent basis of federal jurisdiction. See, *United States v. Local 638,* 347 F.Supp. 164, 165 (S.D.N.Y.1972); 3B Moore's Federal Practice ¶ 24.18[1].

The loan agreements in issue in this case—one executed on April 30, 1975 (the "April Agreement") and the other on October 15, 1975 (the "October Agreement")—have a distinctly international flavor. The parties thereto are defendant The Merban Corporation ("Merban") (the lender), a Swiss corporation with its principal place of business in New York; Venezolana de Cruceros del Caribe, C.A. ("Cariven") (the borrower), a Venezuelan corporation with its principal place of business in Caracas, Venezuela; and plaintiff Corporacion Venezolana de Fomento ("CVF") (the guarantor), a Venezuelan corporation wholly owned by the government of Venezuela and organized to help obtain financing for new industry. The purpose of the loans was to finance Cariven's purchases of two vessels, the S. S. Santa Rosa and the S. S. Santa Paula, from a New York corporation with its principal place of business in New York, defendant Vintero Sales Corporation ("Vintero") (the seller).

The April and October loan agreements were drafted nearly identically. Both provided, in substance, (1) that Merban open for the account of Cariven an irrevocable letter of credit in favor of Vintero for $5,525,000; (2) that Cariven deliver to Merban eight interest-bearing promissory notes, in principal amounts totalling $5,813,950; and (3) that CVF guarantee the obligations assumed by Cariven under the Agreement, with a specific guarantee of the Notes. The first of the April series of notes was to be due November 1, 1976, and the first of the October series, April 15, 1977, with the remaining notes to mature at six-month intervals thereafter, until April 30, 1980, under the April Agreement, and October 15, 1980, under the October Agreement. The Agreements provided that the loans would earn interest at a specified rate to be paid upon the expiration of each period of six months from the dates of execution of the Agreements. In each Agreement, the provision for the CVF guarantee read as follows:

"The 'Corporacion Venezolana de Fomento' of the Republic of Venezuela, an autonomous official institute, domiciled in Caracas, represented by [its 'Chairman' in the April Agreement, and by its 'Acting President' in the October Agreement] . . . authorized for this instrument by the Board of Directors of the Corporacion at its meetings of March 13, 1973, January 23, 1974 and March 8, 1974 and also by the Council of Ministers at its meeting of March 7, 1974, in accordance with Official Communication from the Ministry of the Treasury No. HCP–200–0215 of March 8, 1974, constitutes itself as guarantor and principal debtor to guarantee the obligations assumed by 'VENEZOLANA DE CRUCEROS DEL CARIBE, C.A.' towards 'THE MERBAN CORPORATION' by virtue of the present contract and specifically agrees to endorse the notes which are to be issued in accordance with the provisions of Article 1.6."

On the date of execution of each Agreement, Cariven delivered to Merban eight promissory notes evidencing the indebtedness, each in the amount of $726,743.75. The notes recite that they bear "interests computed from the date of issue, payable every six (6) months until maturity of same." Each note is guaranteed on the face thereof by CVF as follows:

"CORPORACION VENEZOLANA DE FOMENTO of the Republic of Venezuela, herein represented by [its 'President' in the April guarantees and by its 'Acting President' in the October guarantees], duly authorized by its Directory in its meetings held on March 13, 1973 and January 23 and March 8, 1974, and by the Cabinet of the Republic of Venezuela, in its meeting held on March 7, 1974, hereby jointly and severally guarantees, with waiver of any defense, offset, or counterclaim, the payment of this Promissory Note on its due date."

Following Merban's receipt of each series of notes, and pursuant to CVF's request, Merban paid CVF the sum of $87,209.25 as CVF's commission for its guarantee of the Cariven financing.

Thereafter, in accordance with the terms of each Agreement, Merban opened irrevocable letters of credit for the account of Cariven with Security Pacific International Bank ("Security Pacific") in favor of Vintero in the amount of $5,525,000. Vintero subsequently drew $4,143,750 under each letter of credit.

Merban later endorsed each series of Notes in blank and delivered them to Security Pacific as collateral for the credit extended by Security Pacific to Merban. The April Notes were then transferred by Security Pacific to Chemical Bank ("Chemical") to be held by Chemical for the benefit of Security Pacific, Merban and any other persons to whom Merban's affiliate, Merban International, might thereafter sell participating interests in the Notes; the October Notes were held by Security Pacific (rather than Chemical) for the same purpose.

Following the delivery of the April Notes to Chemical, Merban International sold to four Canadian banks—intervening defendants Canadian Imperial Bank of Commerce, The Royal Bank of Canada International Limited, Banque Canadienne Nationale, and Banque Provinciale ("intervenors")—participations in the Notes in the aggregate principal amount of $5,318,950.[2] Chemical issued to each Canadian bank participant a certificate of participation transferring ownership in the Notes to the extent of the interest purchased. Similarly, subsequent to the delivery of the October Notes to Security Pacific, Merban International sold to intervenors LaSalle National Bank ("LaSalle") and American Security and Trust Company ("American Security") participations in the October Notes in the aggregate principal amount of $2,000,000. Each of these banks also received a certificate of

participation (issued by Security Pacific) transferring ownership in the Notes to the extent of the interest purchased.

Merban retains for its own account an interest in the April Notes to the extent of $500,000 in principal amount, and in the October Notes to the extent of $3,813,950 in principal amount.

On April 15, 1976 and April 30, 1976, respectively, Cariven failed to pay the installments of interest which were then due on the October and April Notes. No payments of principal or interest have been made since October 30, 1975. Each of the Notes provides:

"Failure to pay any interests hereunder, within thirty (30) days after due, shall cause the whole note to become due and collectible at once."

Defendant Merban and intervening defendants assert that the Notes are now due and collectible from CVF with interest.

■ As the basis for being relieved of its obligations under the guarantees, plaintiff contends that numerous conditions precedent to their effectiveness were not satisfied and that the guarantees and the loan agreements underlying them were procured by fraud in which Merban, through various of its employees and agents, was a participant. Although the loan "participants" (intervenors) are not alleged to have been a party to any fraudulent or conspiratorial conduct, their own attempt to enforce the guarantees "notwithstanding any right of plaintiff to rescind [them] as against Merban" is resisted on the ground that they did not take the notes in good faith and without notice of defenses against them and are therefore not holders in due course under principles of negotiable instruments.[3]

2. The amounts of the participating interests for each bank are:

| | |
|---|---|
| Canadian Imperial Bank of Commerce | $ 2,813,950 |
| The Royal Bank of Canada International Limited | 1,000,000 |
| Banque Canadienne Nationale | 1,000,000 |
| Banque Provinciale | 500,000 |

3. All parties to this motion have assumed the applicability of New York law. Although Venezuela is a concerned jurisdiction with respect to certain of the issues herein, the parties have not sought to prove Venezuelan law, see Rule 44.1, F.R.Civ.P., or asserted that it is in conflict with the law of New York. The Court itself is not obligated, under Rule 44.1, to take judicial notice of foreign law. Accordingly, no choice-of-law issue is presented, and the Court will apply the law of the forum state, New York.

*April and October Loan Agreements and Guarantees*

### Conditions Precedent

Plaintiff contends that there were six conditions precedent to the effectiveness of its guarantees. These were: (1) that the two ships to be purchased by Cariven have a capacity of 800 passengers each; (2) that a "ship mortgage" ("prenda naval") on each ship in favor of plaintiff be acquired with the funds obtained from the guarantees; (3) that the shareholders of Cariven increase the company's capital of the enterprise to the amount of the guarantee; (4) that the enterprise have available in cash not less than Bs. 2,000,000 (Venezuelan currency) for working capital; (5) that approvals for the transactions be obtained from the Ministry of Communications; and (6) that approvals for the transactions be obtained from the Controller General.

Not one of these alleged conditions appears on the face of any of the promissory notes, and only one of the six (approval of the Controller General) is listed as a condition in the April and October loan Agreements. The remaining conditions are requirements that were imposed by the CVF Board of Directors in its meeting of March 13, 1973 [4]—requirements that were re-confirmed by the Venezuelan Cabinet, in its meeting of March 7, 1974,[5] to be conditions to the granting of the guarantees. Plaintiff asserts that since its guarantees are described on the face of the promissory notes as being "duly authorized" by the CVF Board of Directors and the Venezuelan Cabinet, the substance of the resolutions of those bodies (imposing conditions on the issuance of the guarantees) is part of the underlying contract.

It is important to note that plaintiff does not contend that there was an antecedent understanding or prior agreement among the parties evidencing their intention specifically to incorporate these conditions in the written contract of guaranty. Such a contention would prove unavailing, in any event, under the parol evidence rule, since the contract of guaranty here is "complete and clear and unambiguous upon its face." *Intercontinental Planning Limited v. Daystrom*, 24 N.Y.2d 372, 379, 300 N.Y.S.2d 817, 822, 248 N.E.2d 576, 580, (Ct. of Appeals 1969). Plaintiff, rather, takes the contract as written and advances either of two alternative theories to support treatment of the conditions imposed by the CVF Board of Directors and the Venezuelan Cabinet as conditions precedent to the contract: the first is that "[i]t has long been settled law that a guarantee given pursuant to legislative authority is subject to the terms of the operative legislation and will be construed in connection therewith"; and the second, that where the authority of an "agent" (the reference is presumably to those officers who executed the guarantees on CVF's behalf) is created or described in a writing, a third party is charged with knowledge of the restrictions upon such authority contained in the writing.

Plaintiff's guarantees were not given "pursuant to legislative authority" within the meaning of the New York cases plaintiff relies upon. *Lyman v. Rochester Title Insurance Co.*, 37 App.Div. 234, 55 N.Y.S. 770 (4th Dept. 1899) (statute required applicant for liquor tax certificate to execute bond in favor of People of the State of New York against violation of the Liquor Tax

---

**4.** The specific action taken by the Board of Directors at the March 13 meeting is set forth in a written "Resolution" of the same date. The Resolution is "notice[d] to" various concerned officers and Departments of the corporation including the "President" and "Directors." It states that the Board of Directors has resolved to grant Cariven a guarantee to finance its purchases of "twin ships" and that "[t]he granting of the guarantee is conditioned and subject to" the list of requirements which follows.

**5.** The action taken by the Venezuelan Cabinet ("Council of Ministers") at its meeting of March 7, 1974 is summarized in a letter from the Minister of Finance dated March 8, 1974 (Official Communication HCP–200–0215). The letter states that the Cabinet authorized CVF to grant Cariven a guarantee "on the following conditions." One of these is compliance with "other conditions established by the Board of Directors of CVF in Resolutions Nos. 344 and 117, dated March 13, 1973 and January 23, 1974, respectively."

Law; statute set forth required terms of bond); *People v. Pennock*, 60 N.Y. 421, 426 (1875) (bond required for town supervisor for the faithful discharge of his duties in respect of his custody of public money; form dictated by statute); *People v. Chalmers*, 60 N.Y. 154 (1875) (statute respecting assignment for benefit of creditors required trustee to post bond to secure his faithful performance of duties); *McClusky v. Cromwell*, 11 N.Y. 593, 597 (1854) (canal contractor's bond, for payment of employee's wages, required by statute governing contractors under public works contracts with state; "terms and conditions" of bond fixed, not by contract, but by statute). In those cases, as parenthetically indicated, "statutory bonds" were required to be issued pursuant to the terms of specific laws dictating the terms of the bonds, and the provisions of the laws were, in effect, "read into" the bonds. In the present case, plaintiff does not seek to have its guarantees construed in accordance with a statute delineating the terms of the guarantees and requiring that plaintiff furnish the guarantees. Indeed, plaintiff has not even set forth the "operative legislation" pursuant to which it allegedly issues its guarantees of obligations of Venezuelan companies which seek to borrow funds in the international money markets. There is no contention that this legislation, if it exists, sets out the precise terms of any of CVF's specific guarantees. Thus the cases plaintiff has cited are inapposite.

Plaintiff next contends that Merban was charged with notice of the restrictions on the authority of plaintiff's officers to execute the guarantees. Properly interpreted, the "conditions" that had been imposed by plaintiff's Board of Directors and by the Venezuelan Cabinet were not "restrictions" or "limitations" upon the authority of plaintiff's agents but rather conditions precedent to the granting of authority. Essentially, then, plaintiff's argument is that Merban should have known that plaintiff's officers were not authorized to act except upon the fulfillment of the specified conditions.

Plaintiff never argues, however, that, in executing the guarantees, its officers were acting outside the scope of their actual authority; it is not even suggested that there is a triable issue of fact in this regard. To the contrary, the position that plaintiff has taken in this action, factually, is that, at the time of the execution of the guarantees, it was itself of the impression that the conditions had been fulfilled. Thus, as to four of the requirements that had been imposed by its Board of Directors (passenger capacity, ship mortgage, increased capital and working capital), plaintiff contends that it was fraudulently misled and deceived into believing that the requirements had in fact been satisfied. The remaining two conditions (approval from the Ministry of Communications and the Controller General), were not found to be unsatisfied until after the execution of the Loan Agreements and guarantees. The question of whether Merban had knowledge of the conditions to the granting of the guarantees, or a duty to inquire as to their existence, is irrelevant, so long as plaintiff itself authorized its officers to act in the belief that the conditions had been fulfilled; once authorized, plaintiff's agents acted without restriction, as noted above. Since plaintiff has not suggested or even intimated on this motion that, at the time of their execution of the guarantees, plaintiff's officers were acting at anything but the behest of plaintiff as principal, plaintiff is bound by the acts of its agents within the scope of their actual authority. *Rolfe v. Hewitt*, 227 N.Y. 486, 491, 125 N.E. 804 (1920); 2 N.Y. Jurisprudence § 75. This is true even if plaintiff's granting of the authority was the result of the deception of third parties (other than Merban), see, *e. g., United States v. Basil's Family Supermarket, Inc.*, 259 F.Supp. 139 (S.D.N.Y.1966); see also, *United States v. Spice N Nice, Inc.*, 262 F.Supp. 627, 629 (S.D.N.Y.1967), or of misinformation, oversight or negligence on the part of plaintiff's own agents. Nothing in traditional agency law would make Merban into an insurer that plaintiff's own internal requirements were complied with, or that the judgment of plaintiff's agents on that score

was exercised wisely or correctly. See, e. g., *Restatement (Second) of Agency*, § 165A, comment "a" ("Where authority is stated to be conditioned upon the existence of specified facts, the agent may be authorized to act if he is reasonable, although mistaken, in believing such facts to exist. If the agent is unreasonable in believing such facts to exist, he is unauthorized to act for the principal. Nevertheless, the principal is bound by the agent's act as in other situations involving negligent mistakes by agents"). Under the foregoing principle, if plaintiff's agents were mistaken or negligent in determining whether their own conditions had been satisfied, plaintiff was nonetheless bound.

■ This holding would resolve the issue of the alleged "conditions precedent" in Merban's favor, as a matter of law, were it not for the fact that one of the six alleged conditions—approval of the Venezuelan Controller General—is listed as a condition in the Loan Agreements themselves [6] and thus stands on a significantly different footing from the others. Plaintiff does not deny, in respect to the April Agreement, that Merban, through its Vice-President, Robert J. Redmond, sent plaintiff a Telex message on April 30, 1975 stating that Merban would sign the Loan Agreement only upon the receipt of a return Telex message advising that the approval of the Controller General had been received. Nor does plaintiff deny that Merban received the same day in return a Telex message from plaintiff confirming unconditionally that the Controller General had approved the transaction. Plaintiff's argument is that the aforesaid approval of the Controller General was "legally ineffective" under Venezuelan law. As to the October Agreement, plaintiff contends that no approval from the Controller General was ever forthcoming.

On both issues, the parties are in dispute. In response to plaintiff's contentions, Merban has refused to concede non-compliance with the requirement of approval from the Venezuelan Controller General. The issue is one of fact, therefore, that should be resolved at trial, and legal questions pertaining thereto (possibly of waiver and estoppel) will be reserved for that time.

*Fraud*

■ The question of the participation of Merban or its officers or agents in a scheme to defraud plaintiff is another that this Court will not determine on the motion for summary judgment. Plaintiff's claim is that defendant Vincent A. DeLyra—acting at least partially on behalf of Merban—engineered an elaborate scheme to induce plaintiff to execute the guarantees of the Cariven financing on the basis of the submission of numerous falsified documents. DeLyra was at once President of Vintero, forty-nine percent stockholder of Cariven and agent of Merban in Venezuela. The available documents do suggest—strongly— that DeLyra conducted his questionable activities without the knowledge and independently of his agency with Merban. But they do not establish this conclusively. On a motion for summary judgment, all ambiguities and reasonable inferences must be drawn in favor of the party against whom summary judgment is sought. *Heyman v. Commerce and Industry Insurance Company*, 524 F.2d 1317, 1320 (2d Cir. 1975). And, as Professor Moore cautions, the remedy is "apt to be inappropriate in an action based on a complex scheme of fraud where the court is asked to decide the motion on lengthy affidavits and documents and voluminous depositions." 6A Moore's Federal Practice ¶ 56.17[27]. On the basis of the

---

**6.** It should be noted that the necessity of approval from the Venezuelan Controller General is referred to, in somewhat varying terms, in *both* the March 8, 1974 letter of the Minister of Finance, summarizing the meeting of the Venezuelan Cabinet of March 7, 1974, and the April and October Loan Agreements. The reference in the Minister of Finance's letter is to the Controller General's approval of the purchase price of the ships to be acquired by Cariven; the reference in the Loan Agreements is to the Controller General's approval "referred to in Article 5 of the Law for the Protection and Development of the National Merchant Marine."

parties' submissions thus far, and without the benefit of live testimony, the Court is simply not able to make a conclusive determination as to whether or not the fraud allegedly perpetrated by DeLyra was within the scope of his actual or apparent agency with Merban. Resolution of this issue must await the test of trial.

*Status of Intervenors*

To defeat the holder in due course status of intervenors, plaintiff suggests, in the first instance, that they are not "holders" of the promissory notes in which they have purchased participating interests. The facts with respect to the rights of intervenors are largely contained in documents and letters which have been submitted for the Court's consideration and are not the subject of factual dispute. The Notes are not in the physical possession of intervenors but rather in the custody of Chemical (in the case of the April series of Notes) and Security Pacific (in the case of the October series). Merban arranged for the delivery of the Notes to Chemical and Security Pacific with instructions to these banks to issue participation certificates to purchasers of interests in the Notes. The certificates contain variations in language but, in substance, "irrevocably assign"[7] to each intervenor the amount of its participation in the Notes; the certificates issued to the Canadian banks specifically state that Chemical will treat the holders thereof as the "absolute owner[s]" of the interests covered by the certificates.

The certificates confirm that the role of Chemical and Security Pacific is that of depository and collection agent. The certificates issued by Chemical to each Canadian bank state:

"We . . . shall present these notes to the Chemical Bank, New York, for collection at their maturity and pay the above amounts to you in accordance with

your instructions, if and when the amounts have been received by us in payment of these promissory notes. We shall have no liability or responsibility to the participant other than to account for collections or payments of interest and principal actually received by us on account of the aforementioned."

Those issued by Security Pacific to each American bank state:

"Subject to the terms and conditions of the Notes and further subject to [Security Pacific] having received from the Maker funds sufficient to pay the entire face amount of each Note, the amounts due in respect of each Participation shall be payable upon presentation of this Certificate at the aforesaid office of [Security Pacific].

\*　　\*　　\*　　\*　　\*　　\*

"[Security Pacific] shall have no duty, liability or responsibility in any capacity (whether of agency, trust or otherwise) to the Participant or any other person except to present the Notes for collection at maturity and account to the Participant to the extent of its Participation for amounts received by [Security Pacific] in respect of the Notes and no other duty, liability or responsibility shall be inferred or implied."

The first issue raised by plaintiff is whether intervenors can qualify as "holders" of negotiable instruments under Article 3 of the New York Uniform Commercial Code (hereinafter "UCC") in the face of the fact that they never took physical possession of the promissory notes. U.C.C. § 1–201(20) defines "holder" as "a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank." A person becomes the holder of an instrument through its negotiation to him. U.C.C.

---

**7.** The quoted language appears only in the certificates issued to the Canadian banks; however, those issued to the American banks state, to the same effect:

"The Merban Corporation ("Merban") \* \* \* hereby acknowledges that LaSalle National Bank [American Security and Trust Company] \* \* \* is the holder of participations to the extent set forth below in the following promissory notes made by Venezolana de Cruceros del Caribe C.A. (the "Maker") and guaranteed by Corporacion Venezolana de Fomento."

§ 3–202(1). If the instrument is payable to order, it is negotiated by delivery with any necessary indorsement(s). U.C.C. § 3–202(1). If it is payable to bearer, delivery alone is sufficient. U.C.C. § 3–202(1).

■ The promissory notes at issue in the present case were originally payable to the order of Merban; when Merban indorsed them in blank,[8] they became payable to bearer and could be negotiated by delivery alone. U.C.C. § 3–204(2).

The U.C.C. defines delivery as the "voluntary transfer of possession." U.C.C. § 1–201(14). It does not specify, however, whether delivery may be either "actual" or "constructive." Under § 2 of New York's former Negotiable Instruments Law (in effect prior to the adoption of the U.C.C.), "delivery" was defined as the "transfer of possession, actual or constructive, from one person to another." There appears to be general agreement that since the U.C.C. does not prescribe any new definition of the term, the definition of "delivery" under the prior law should be deemed to continue. See, e.g., Billingsley v. Kelley, 261 Md. 116, 274 A.2d 113, 118–19 (1971); Snyder v. Town Hills Motors, Inc., 193 Pa.Super. 578, 165 A.2d 293, 294–95 (1960); 2 Anderson, The Uniform Commercial Code § 3–102:8 at 588 (2d ed. 1971). Plaintiff does not contest this point but rather submits that constructive delivery and possession cannot be found on the facts of this case.

■ Under the law of New York, constructive delivery may be accomplished through the vehicle of an agent. Thus, in Wolfin v. Security Bank, 170 App.Div. 519, 156 N.Y.S. 474, 476 (1915), aff'd without opinion, 218 N.Y. 709, 113 N.E. 1068 (1916), the Court stated that constructive delivery may be effected " 'by direction to a third person in actual possession of the instrument to deliver it to, or to hold it for, the payee.' " In an earlier case, Worth v. Case, 42 N.Y. 362, 367 (1870), the New York Court of Appeals had said, similarly:

"There is no doubt, that a delivery of a deed or note, or other obligation, to one person in favor of, and for the benefit of another, constitutes a valid and binding delivery as against the party who delivers it, whether the party in whose favor it is delivered is owner of it or not; and for the purpose of protecting his interests, the law holds the party receiving the delivery as his trustee, and makes his acceptance of it the acceptance of the beneficiary. And this, too, whether the person receiving the delivery knows the contents of the instrument or not, and whether he does anything more than merely receive it or not."

See also, Hall v. Bank of Blasdell, 306 N.Y. 336, 341–42, 118 N.E.2d 464 (1954).

■ The essential ingredient of a constructive delivery is that it be made with the unmistakable intention of transferring title to the instrument. Bacal v. National City Bank, 146 Misc. 732, 262 N.Y.S. 839 (2d Dist. 1933); 2 Anderson, The Uniform Commercial Code, § 3–202:38 at 775 (2d ed. 1971). See also, Grannis v. Stevens, 216 N.Y. 583, 587–88, 111 N.E. 263 (1916); First National City Bank v. Frederics-Helton Travel Service, Inc., 29 Misc.2d 1041, 209 N.Y.S.2d 704, 707 (1961).

■ The undisputed facts in this case establish as a matter of law that Merban intended to relinquish all power and control over the promissory notes to the extent that it sold interests therein to intervenors. Chemical and Security Pacific were specially directed by Merban to issue certificates of participation in the Notes, and the certificates themselves recite Merban's instruction to "irrevocably assign" to intervenors the amounts covered by the Notes. Chemical and Security Pacific are thus the agents through which Merban made constructive delivery of the Notes to intervenors to the extent of their interests therein.

There is no basis for plaintiff's suggestion that the constructive possession of intervenors is negated in this case by the language

---

**8.** Although the participation certificates issued by Chemical state that the Notes were indorsed to Chemical's order, this is an obvious misstatement; an examination of the reverse side of the Notes themselves shows that they were indorsed in blank.

of the certificates themselves.[9] To the contrary, the banks explicitly obligate themselves in the certificates to account to intervenors (to the extent of their participations) for amounts received in payment of the Notes. The fact that Chemical and Security Pacific also retain possession of the Notes for the account of Merban, to the extent of its retained interest, is not inconsistent with constructive possession by intervenors to the extent of their participating interests. Intervenors are thus "holders" of the Notes under the applicable law.

█ Drawing upon the Official Comment to U.C.C. § 3–302(4), plaintiff next contends that the holder of a limited interest in an instrument is confined to one with a "collateral security interest" therein as opposed to full equity ownership. As an example of a holder of a limited interest, the Official Comment uses "a pledgee in a security transaction." See also, *Tucker v. Meredith,* 98 U.S.App.D.C. 90, 232 F.2d 347 (1956); *In Re Levine's Estate,* 156 Misc. 836, 282 N.Y.S. 769 (1935). But there is nothing in either the statutory provision itself or the Official Comment to suggest that this is anything more than illustrative. The statute provides that "[a] purchaser of a limited interest can be a holder in due course only to the extent of the interest purchased." Under the U.C.C., "purchasers" include those taking by "sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property." U.C.C. § 1–201(32), (33).[10] The terms of the statute are thus inconsistent with the theory that holders of limited interests are confined to those with "security interests" in negotiable property. Intervenors, in the present case, acquired their participations by "purchase" within the meaning of § 1–201(32) and are thus holders thereof to the extent of their interests purchased.

Plaintiff has also suggested that, rather than holders of the underlying promissory notes, intervenors should be characterized as owners of "investment securities" within Article 8 of the U.C.C. Plaintiff further submits that the participations held by intervenors fall within the definition of "security" in the Securities Exchange Act of 1934, 15 U.S.C. § 78c(10). Whether or not this is the case, however, the participations are not "investment securities" under Article 8. U.C.C. § 8–102(1)(a) provides that a security is an instrument which

> "(i) is issued in bearer or registered form; and
>
> "(ii) is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
>
> "(iii) is either one of a class or series or by its terms is divisible into a class or series of instruments; and
>
> "(iv) evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer."

None of the certificates produced for the Court's examination is in "bearer or registered form," see U.C.C. § 8–102(1)(d), (c), or "one of a class or series or by its terms . . divisible into a class or series of instruments." Accordingly, intervenors are holders of the underlying promissory notes, rather than owners of investment securities, and their rights are governed by Article 3 of the U.C.C.

Assuming, *arguendo,* that intervenors are holders of the Notes, plaintiff claims that they did not purchase their interests in good faith and without notice and, therefore, do not meet the requirements for being holders in due course under U.C.C. § 3–302(1).

**9.** It is certainly of no moment that in the particular certificate issued The Royal Bank of Canada, Chemical describes itself as agent of Merban. Obviously, Chemical *was* Merban's agent for the purpose of taking custody of the Notes to effect the irrevocable assignment of Royal's participating interest.

**10.** The "general definitions" contained in Article 1 are applicable throughout Article 3. U.C.C. § 3–102(4).

Plaintiff's argument is built on a single factual premise which is not disputed: that intervenors were in possession of the loan agreements and guarantees at the time that they purchased their participations in the promissory notes. Since the Agreements and guarantees, plaintiff continues, made express reference to the resolutions authorizing their issuance, intervenors should have conducted an investigation and inquiry into the substance of the resolutions prior to their entering into the transaction with Merban. Plaintiff's point, apparently, is that defenses to the guarantor's obligations would then have come to light.

The argument, then, is *not* that intervenors had actual notice of a defense or even "reason to know" of the existence of a defense, see U.C.C. § 1–201(25), from the documents that were available to them. Rather, it is that they breached a duty to inquire and thus failed to act in "good faith."

▆ "Good faith" is defined as "honesty in fact in the conduct or transaction concerned." U.C.C. § 1–201(19).[11] It is clear that the draftsmen of the U.C.C. intended to adopt a subjective standard for the good faith test in Article 3, as had been generally applicable under the Negotiable Instruments Law. See, *e.g., Von Gohren v. Pacific National Bank,* 8 Wash.App. 245, 505 P.2d 467 (1973); White and Summers, *Handbook of the Law under the Uniform Commercial Code* 472 (1972). In *Manufacturers & Traders Trust Co. v. Sapowitch,* 296 N.Y. 226, 230, 72 N.E.2d 166, 168 (1947), the New York Court of Appeals formulated the standard as follows:

"One who purchases commercial paper for full value before maturity, without notice of any equities between the original parties, or of any defect of title, is to be deemed a bona fide holder. He is not bound at his peril to be upon the alert for circumstances which might possibly excite the suspicions of wary vigilance. He does not owe to the party who puts negotiable paper afloat the duty of active inquiry, to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by speculations in regard to the purchaser's diligence or negligence. . . ."

Bad faith, then, is obviously something far more extreme than a failure to observe reasonable commercial standards or the standards of a reasonably prudent man. It "is not mere carelessness. It is nothing less than guilty knowledge or willfull ignorance." *Manufacturers & Traders Trust Co. v. Sapowitch, supra.* See also, *Hall v. Bank of Blasdell, supra* at 467. The issue, essentially, is whether the circumstances of which the holder has knowledge "rise to the level that the failure to inquire reveals a deliberate desire on his part to evade knowledge because of a belief or fear that investigation would disclose a defense arising from the transaction." *General Investment Corp. v. Angelini,* 58 N.J. 396, 278 A.2d 193, 9 U.C.C. Rep.Serv. 1 (1971). See also, *Manufacturers Traders & Trust Co. v. Sapowitch, supra.*

It is probable that the written language of the Loan Agreements and guarantees in the present case would not even have excited the suspicions of a reasonable man. Contrary to plaintiff's assertion, these documents did not refer to the "resolutions" authorizing the issuance of plaintiff's guarantees, although, even if they had, the language might well have been regarded as singularly bland. Rather, they referred to the "meetings" at which the granting of the guarantees was given due authorization. Again, such language would more reasonably have been taken by the potential holder as indicative of the soundness of the Notes than as a danger signal, especially since these were governmental guarantees. And certainly the employment in the guarantees of the phrase "joint and several" liability was not "highly unusual" on its face. Plaintiff has offered no suggestion why it was in the present context.

▆ In any event, even if the "reasonable" course to have followed in this case

---

**11.** See footnote 10.

would have been to make further inquiry, or to retain foreign counsel to investigate the authorization for the guarantees, such conduct was not required under the subjective standard of good faith. What is dispositive here is that the documents that were available to intervenors provided no basis whatsoever for the speculation that an impropriety infected the principal transaction. To the extent that intervenors remained ignorant of plaintiff's Board resolutions or of the "conditions precedent" therein, they were not "willfully" so.

Accordingly, they took their instruments in good faith and without notice and are holders in due course under U.C.C. § 3–302. As holders in due course, they are not subject to the defense of fraud in the inducement asserted against Merban, see U.C.C. § 3–305(2); *2 Anderson, The Uniform Commercial Code* § 3–305:31 at 868 (2d ed. 1971), and are thus entitled to recover summary judgment against plaintiff on the promissory notes.

*Conclusion*

The motions of defendants Merban, Redmond and Himoff for summary judgment are denied. The case will proceed to trial on the issue of fraud and on the narrow issue of whether approvals were obtained from the Venezuelan Controller General for the April and October transactions, as required in the respective Loan Agreements.[12]

The motions of intervenors for summary judgment on their counterclaims are granted. Settle judgment order on notice.

SO ORDERED.

---

12. The court notes that no securities law claim has been pleaded in plaintiff's complaint and therefore none is properly before this Court.