**Leon RUSSELL and Truman Coffey, d/b/a McDonald County Livestock Market, Appellees,**

v.

**MAXSON SALES COMPANY, a partnership composed of W. A. Maxson, Dale D. Maxson, Guy Maxson and C. W. Maxson, Appellant.**

No. 50142.

Supreme Court of Oklahoma.

Feb. 27, 1979.

As Amended March 8, 1979.

---

6.  *Harvey v. Hall, 471 P.2d 911 (Okl.1970); Cullison v. Triplett, 281 P.2d 743 (Okl.1955).*

George P. Pitcher, Thomas Jot Hartley, Legal Intern, Vinita, for appellees.

Ronald E. Fry, Bailey & Fry, Vinita, for appellant.

BARNES, Justice:

In this case, we are asked to review the orders and judgment rendered by the Trial Court in a case commenced in the Trial Court by Leon Russell and Truman Coffey, d/b/a McDonald County Livestock Market (Livestock), in which Livestock sought payment of a negotiable instrument, a check written by Maxson Sales Company, a partnership (Maxson). At the conclusion of the trial below, the Trial Court, sitting as both trier of fact and law, entered judgment in favor of Livestock. Maxson has perfected a timely appeal from the ruling of the Trial Court, arguing that:

1. Livestock was not a holder of the check, and Maxson, drawer of the check, therefore had no contractual obligations running to Livestock.

2. Maxson's obligations on the check have been discharged by satisfaction of the obligations to the holder of the check, McDonald County Bank of Pineville, Missouri.

We agree with both of the Appellant's contentions, and reverse the action of the Trial Court. The facts giving rise to the controversy are as follows:

On August 9, 1973, Maxson wrote a check to one Paul Durbin in the amount of $29,-290.86 for the purchase of livestock from Durbin. On the same day, Paul Durbin repurchased a part of his livestock and wrote a check to Maxson for $16,002.34. Mr. Durbin endorsed the check written to him by Maxson, by merely inscribing his signature on the back of the instrument, thus making the instrument a bearer instrument.[1] That check, together with another, was then deposited in the McDonald County Bank at Pineville, Missouri (depositor bank). The total face amount of both checks deposited was $38,553.29. The deposit slip, signed by Mrs. Durbin, instructed that $38,145.06 of the deposit was to be

---

1. 12A O.S. 1971, § 3–204(2), provides in part that:

"An indorsement in blank specifies no particular indorsee and may consist of a mere signature. An instrument payable to order and indorsed in blank becomes payable to bearer . . . ."

credited to the account of Livestock, who also had an account in the depositor bank, to cover a check written to Livestock by Durbin on another bank, which had been returned because of insufficient funds. Following these instructions, the bank immediately credited Livestock's account in the amount requested.

In the interim, Maxson presented Durbin's check in the amount of $16,002.34 for payment, and at that time learned that the check could not be honored due to insufficient funds. We note here that Durbin's check to Maxson was written on his account at the McDonald County Bank, the same bank in which he had just made the deposits, instructing that most of the proceeds be credited to Livestock.

Upon learning that Durbin's check could not be honored, Maxson notified its bank, a bank different from the depositor bank, to stop payment on its check for $29,290.86. The stop-payment order was followed, and when the McDonald County Bank presented Maxson's check for payment, they were notified of the stop-payment order.

Upon receiving notification of the stop-payment order, the depositor bank contacted Maxson by phone, and upon learning that Maxson had a returned check for $16,002.34 written by Durbin on their bank, the bank agreed to accept Maxson's check in the amount of $13,288.52, in satisfaction of Maxson's check for $29,290.86 to Durbin. The $13,288.52 amount was arrived at by deducting the amount of Durbin's check to Maxson, which was returned because of insufficient funds, from the face amount of Maxson's check to Durbin.

After accepting Maxson's second check, the bank, presumably acting in accordance with the right of charge-back, set forth at 12A O.S. 1971, § 4–212,[2] charged back the amount of credit given to Livestock.

Arguing that by virtue of Durbin's instructions on the deposit slip, they became holders of Maxson's check, Livestock brought an action on the check against Maxson. The Trial Court's judgment in favor of Livestock is now before us for review.

■ Under the provisions of 12A O.S. 1971, § 3–301,[3] a holder of an instrument,

**2.** 12A O.S. 1971, § 4–212, provides:

"(1) If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the items if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. These rights to revoke, charge-back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final (subsection (3) of Section 4–211 and subsections (2) and (3) of Section 4–213).

"(2) Within the time and manner prescribed by this section and Section 4–301, an intermediary or payor bank, as the case may be, may return an unpaid item directly to the depositary bank and may send for collection a draft on the depositary bank and obtain reimbursement. In such case, if the depositary bank has received provisional settlement for the item, it must reimburse the bank drawing the draft and any provisional credits for the item between banks shall become and remain final.

"(3) A depositary bank which is also the payor may charge-back the amount of an item to its customer's account or obtain refund in accordance with the section governing return of an item received by a payor bank for credit on its books. (Section 4–301).

"(4) The right to charge-back is not affected by

(a) prior use of the credit given for the item; or

(b) failure by any bank to exercise ordinary care with respect to the item but any bank so failing remains liable.

"(5) A failure to charge-back or claim refund does not affect other rights of the bank against the customer or any other party.

"(6) If credit is given in dollars as the equivalent of the value of an item payable in a foreign currency, the dollar amount of any charge-back shall be calculated on the basis of the buying sight rate for foreign currency prevailing on the day when credit was given."

**3.** Title 12A O.S. 1971, § 3–301, provides:

"The holder of an instrument whether or not he is the owner may transfer or negotiate it and, except as otherwise provided in Section 3–603 on payment or satisfaction, discharge it or enforce it in his own name."

*whether or not he or she is the owner*, may on payment or satisfaction discharge the instrument.

The Uniform Comment to that Section indicates that *every holder* has such rights.

A holder is defined at 12A O.S.1971, § 1–201(20), which provides:

" 'Holder' means a *person who is in possession* of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank." [Emphasis added]

■ All holders, whether or not holders in due course (defined at 12A O.S. 1971, § 3–202), have the power to discharge an instrument upon payment or satisfaction.

■ The only limitations upon a holder's right to discharge an instrument are set forth at 12A O.S. 1971, § 3–603, which provides in part:

"(1) The liability of any party is discharged to the extent of his payment or satisfaction to the holder even though it is made with knowledge of a claim of another person to the instrument unless prior to such payment or satisfaction the person making the claim either supplies indemnity deemed adequate by the party seeking the discharge or enjoins payment or satisfaction by order of a court of competent jurisdiction in an action in which the adverse claimant and the holder are parties. . . ."

■ Despite the fact that Livestock may have rights to the proceeds of the check, it is clear that Livestock was at no time the holder of the check, for at no time did Livestock have possession of that check, either by virtue of personal possession or possession by an agent.[4]

Despite the fact that Livestock did not have possession of the instrument, Livestock urges this Court to hold that they were nonetheless holders of the check. If we were to rule that one not in possession of an instrument were the holder, an inordinate burden would be put upon drawers, makers and acceptors of negotiable instruments, for they would be required to ascertain who the holder of a particular instrument was prior to payment or satisfaction. Otherwise, these makers, drawers or acceptors would run the risk of paying a party in possession of the instrument who presented it for payment, but who, in fact, was not the holder, and therefore would not have the power to discharge the instrument.

■ To avoid such difficulty, the drafters of the Code provided that in order to be a holder one must have possession of an instrument. One of the underlying purposes and policies of the Uniform Commercial Code, as set forth at 12A O.S. 1971, § 1–201, is to simplify, clarify and modernize the laws governing commercial transactions. That Section also provides that the Code shall be liberally construed and applied to promote its underlying purposes and policies. To hold that one not in possession of an instrument were its holder would clearly not simplify commercial transactions, but would, as shown above, create virtual chaos in the commercial world. This being so, we cannot accept Livestock's argument that they were the holder of the instrument, although they never had possession of the same. Rather, the depository bank, who had physical possession of the instrument, which was a bearer instrument, was the holder, whose discharge of Maxson's obligations on the check relieved Maxson of its

4. In the case before us, the depositor bank, while acting as a collection agent pursuant to the provisions of 12A O.S. 1971, § 4–201, was acting as agent for the owner of the item, Durbin, who deposited the checks in the bank. The instructions on Durbin's deposit slip did not make Livestock an owner of either of the checks deposited, as the amount asked to be credited to Livestock's account exceeded the face value of either of the instruments, but was less than the total of both instruments. Thus, the instructions on the deposit slip can only be construed as an instruction to the bank to credit Livestock's account *with the proceeds* of the check. This being the case, Livestock did not become an owner of either of the instruments deposited, and thus the bank cannot be said to have been acting as Livestock's agent for collection purposes, as under the provisions of 12A O.S. 1971, § 4–201, the collecting bank acts as the agent or subagent of the owner of an instrument.

obligations on the check, as the bank, being the holder, had the power to discharge the instrument, pursuant to the provisions of 12A O.S. 1971, §§ 3–301 and 3–603.[5]

█ Having held that the depository bank, as holder of the instrument, had the power to discharge it, we lastly consider whether the bank's discharge operated as a total, as opposed to a partial, discharge. Livestock argues that Maxson's payment of $13,258.52 did not operate as a total discharge of its obligations on the $29,290.86 check. Rather, Livestock argues that the payment only operated as a partial discharge to the extent of the payment made. We find this argument untenable, for in addition to making the $13,258.52 payment, Maxson, as part of its agreement with the bank in settlement of the check, relieved Durbin of his obligation on the $16,602.34 check. Accordingly, we hold that the bank's discharge of Maxson's obligations operated as a total discharge of all obligations on the check.

Having held that Appellee Livestock was not the holder of the check, and the holder of the instrument, the depository bank, discharged all of Maxson's obligations on the check, we hold that the Trial Court erred in granting judgment in favor of Livestock. Accordingly, we reverse the Trial Court's decision. In so doing, we remand the action to the Trial Court for consideration of an award of reasonable attorney fees to Appellant Maxson, as the prevailing party in an action to recover on a check, pursuant to the provisions of 12 O.S. 1971, § 936.

REVERSED AND REMANDED.

LAVENDER, C. J., and WILLIAMS, HODGES, SIMMS, DOOLIN and HARGRAVE, JJ., concur.

IRWIN, V. C. J., and OPALA, J., concur in result.

OPALA, Justice, concurring in result:

Livestock, having received credit from the Bank [McDonald County Bank] for the $13,288.52 settlement payment of Maxson, brought this action to recover from Maxson $16,002.34—the unpaid balance on Maxson's $29,290.86 check to Paul Durbin [Durbin]. Livestock claims to be a holder in due course of that check which, it alleges, was "endorsed and delivered" to it "for value" when Durbin's wife, Donna, deposited the check in the Bank, along with another for $9,262.43, with her signed instruction to credit Livestock's account for $38,145.06. The check, when deposited, bore Paul Durbin's blank endorsement on its reverse side.

At least three (3) theories might be advanced to explain the legal effect Donna's signed instruction had on Livestock's status vis-a-vis the Bank: (a) the deposit slip became, in the Bank's hands, an allonge to Maxson's check, as defined by § 3–202(2),[1] bearing Donna's special endorsement to Livestock, within the meaning of § 3–204(1), and so transferring the instrument by negotiation and delivery; (b) the deposit slip is not a part of the check as an allonge and operates merely as a common-law assignment of proceeds from collection of two checks; or (c) since the aggregate amount Donna asked to be credited to Livestock's account [$38,145.06] exceeded the stated sum of either of the two checks she deposited [Maxson's $29,290.86 and another for $9,262.43] but was less than the total of both of them, Donna's signed instruction must be considered in law as an attempt to transfer "less than the entire instrument" in either check so as to operate as "partial assignment" of both checks within the meaning of § 3–202(3).

We need not pause here to consider, must less decide, any of these issues which could

---

5. In ruling that the depository bank was the holder of the check, we by no means mean to suggest that the bank was a holder, in due course, as to achieve that status the bank would have had to give value for the instrument. See 12A O.S. 1971, §§ 3–302, 4–208 and 4–209. From the record before us, it is impossible to determine whether the bank gave value for the instrument. Thus, we are unable to say whether or not the bank was a holder in due course.

1. All citations in the text and footnotes, unless indicated otherwise, are to 12A O.S. 1971.

be more appropriately litigated in an action by Livestock against Durbin or the Bank. Some, if not all of these issues, might even be governed by the law of Missouri where the Durbin deposit was made. Since the pertinent U.C.C. provisions likely to be invoked are susceptible of different interpretation, we should be loath here to prejudge the matter, because in this lawsuit the rights of Livestock vis-a-vis Maxson, the only parties before us, may be easily decided without settling Livestock's status as holder in due course of Maxson's check for $29,290.86.

The dispositive issue before us, somewhat eclipsed by the advocates' rhetoric, is whether Maxson's $13,288.52 payment to the Bank in settlement of his liability on the $29,290.86 check in suit operates as an effective *in toto* discharge of the instrument and bars Livestock's action.

When, on receiving Maxson's $13,288.52 [2] payment, the Bank delivered to him the check in suit, it was a bearer instrument. It bore but one blank endorsement of Paul Durbin, the payee.[3] Nowhere on the instrument was there Livestock's endorsement. From the four corners of the check there could be no doubt but that the Bank had authority to effect a discharge of the instrument either as Durbin's agent for collection[4] or as its possible holder in due course.[5] The face of the instrument did not reveal any interest or equity in it was held by Livestock. The proof does not disclose Maxson had notice *aliunde*[6] of Livestock's claim. If ever owner or holder in due course of the check in suit, Livestock was to Maxson, at the very best, but an undisclosed principal of the Bank.[7] Indeed, there is evidence in the record from which we may find that in effecting a settlement with Maxson the Bank was also acting, with Livestock's consent, as its agent for collection. The agency relation would, of course, make Livestock bound by the Bank's discharge, whether that stood disclosed or was unknown to Maxson.

As I view this lawsuit, Maxson's settlement with the Bank, as apparent agent for Durbin, the ostensible owner of the check [and Maxson's obligor on the other $16,002.34 check] was a transaction *inter partes* in which Maxson's set-off defense was available.[8] Even if, as between Durbin and Livestock, Livestock were the owner of the instrument—a question we need not address here—[9] the Bank as ostensible prima facie agent for either or both could and did effect a binding settlement which operates to discharge Maxson's entire liability on the instrument.[10] It simply makes *no difference here whether the Bank's possession of*

---

2. The amount of the payment represents the difference between Maxson's $29,290.86 check to Durbin, which is here in suit, and Durbin's $16,002.34 check to Maxson [previously returned to Maxson because of insufficient funds].

3. § 3–204(2).

4. § 4–201.

5. A bank that gives credit available for withdrawal acquires a security interest in an item and may claim in it the status of a holder in due course. §§ 4–208 and 4–209. But not so if the bank collecting for payee knows of maker's defense. *Oklahoma National Bank v. Equitable Credit Finance Co.,* Okl., 489 P.2d 1331 (1971).

6. The nature of notice is defined by U.C.C., §§ 1–201(25) and 3–304.

7. There is no proof here that Donna's deposit slip (instructing the Bank to credit Livestock's account for $38,145.06) was in fact attached as an *allonge* to the check when it was presented to Maxson for payment. Absent some physical attachment, the credit slip could not operate, as to Maxson, as an allonge. See *Estrada v. River Oaks Bank & Trust Co.,* 550 S.W.2d 719, 725 (Tex.Civ.App.1977); *West Point Wholesale Grocery Company v. Bulls,* 44 Ala.App. 573, 217 So.2d 83, 85 (1968); Anno. 19 A.L.R.3d 1297, 1299.

8. § 3–302(1)(c); *Brotherton v. McWaters,* Okl., 438 P.2d 1 (1968). The terms of § 3–301 plainly authorize *any holder* to discharge an instrument upon payment, whether holder in due course or not.

9. § 4–201.

10. §§ 3–301 and 3–601(2).

*the check was as Durbin's or Livestock's agent.*[11]

Livestock's claim the discharge operated *pro tanto* [to the extent of the $13,288.52 payment by Maxson] is untenable. This is so because as the Bank's disclosed or undisclosed principal for collection Livestock cannot now qualify, under the provisions of § 3–603(1), as *"another person"* whose right to collect the balance of the instrument may stand preserved.[12]

Maxson's check in suit had been discharged before this action was brought. No recovery can be had here against Maxson regardless of Livestock's status vis-a-vis Durbin or the Bank. The result reached by the court is correct, but its reasons are substantially different from mine.

I am authorized to state that IRWIN, V. C. J., concurs in these views.

11. Possession alone does not make one holder in due course. The possession must also meet the transfer by negotiation requirements of § 3–202. See *Estrada v. River Oaks Bank and Trust Co.*, supra note 7, at p. 724. If the Bank had possession of Maxson's check as Livestock's rather than Durbin's agent, Livestock would satisfy the possession requirement of § 1–201(20) but not necessarily the transfer by negotiation test of § 3–202 because Donna's credit slip might be no more than a common-law partial assignment or assignment of collection proceeds.

12. So far as the record informs us, Livestock is a stranger to the instrument who did not make its claim known to Maxson before discharge was effected. § 3–603(1). Livestock knew of the Bank's settlement with Maxson and agreed to "stand the loss" of the uncollected difference of $16,002.34, in the sense that credit for that amount was allowed to be withdrawn from its account.