Joe D. GRAY, Appellee,

v.

Jim W. CARTER, Appellant.

No. 70904.

Court of Appeals of Oklahoma,
Division No. 1.

April 10, 1990.

Rehearing Denied May 29, 1990.

Certiorari Denied Oct. 2, 1990.

Gary F. Duckworth, Oklahoma City, for appellee.

D. Kent Meyers, Robert E. Bacharach, Crowe & Dunlevy, Oklahoma City, for appellant.

## OPINION

GARRETT, Presiding Judge:

The primary issue before us in this appeal is the applicability of 12A O.S.1981 § 9–506 to the facts herein. The parties entered into a stipulation of the facts prior to trial. These agreed facts indicate Appellant Jim W. Carter (Carter) and Appellee Joe D. Gray (Gray) formed a corporation with Pete Eischen (Eischen) in July, 1984 for an automobile dealership. Carter and Gray each owned 37½% of the stock in the

company and Eischen owned the remaining 25%. Gray borrowed $151,070.00 from Fairview State Bank and pledged his stock as collateral for the loan. On September 4, 1986, Fairview State Bank failed and its assets were sold to Community National Bank of Okarche, with an option to sell any unwanted assets to The Federal Deposit Insurance Corporation (FDIC). Gray's promissory note and collateral were subsequently sold to the FDIC as unwanted collateral. Gray, unaware of this transaction, continued to make monthly interest payments on the note to Community National Bank of Okarche through January 7, 1987.

On January 30, 1987, a few days before Gray's note was due, Carter, by and through his agent and attorney, Ronald Phelps (Phelps), paid $152,354.00 to the FDIC to purchase the note. The note could not be physically located, however, so the FDIC gave Phelps a letter to the bank authorizing the bank to release the collateral to Phelps. On February 2, 1987, Phelps presented the letter to the bank and was given possession of the collateral.

On February 5, 1987, Phelps mailed a notice to Gray informing him that Carter had purchased the note from the FDIC, that the note was due to be paid in full on February 7, 1987, and if not paid, the collateral would be sold at public auction on February 18, 1987.

Gray contacted the FDIC and was advised that his attorney had paid off the note. Gray informed the FDIC employee who handled the transaction, Shekhar Bhat, that he had no attorney, and Bhat acknowledged that he mistakenly thought Phelps was representing Gray when he accepted Phelps' payment on the note.

A meeting was held between Phelps and the FDIC wherein Phelps demanded that the FDIC relinquish the promissory note to him on behalf of Carter, and the FDIC refused. In turn, Phelps refused to return the collateral to the FDIC. On February 17, 1987, FDIC attorney Mary Phillips (Phillips) sent a letter to Phelps in which she demanded the immediate return of the collateral upon tender of Carter's money because FDIC employee Bhat had mistaken Phelps as a representative of Gray who was paying off the note on Gray's behalf. Phillips notified Phelps in the letter that the FDIC had possession of the promissory note and that the note had not been assigned to Carter, thus Carter and Phelps had no authority to hold and/or sell the stock at any time.

Carter retained a Washington, D.C. attorney, J. Kirk Wade, (Wade) to represent him in the matter. Wade conducted extensive negotiations with the FDIC from February 17, 1987 until April 30, 1987 in order to obtain the note for Carter. Wade also negotiated with Gray for purchase of Gray's stock upon Gray's payment of the note. Carter made an offer to the FDIC on March 23, 1987 to take no action on the note or collateral if the FDIC would agree to assign the note and its interest under the security agreement and in the collateral to Carter on April 30, 1987. The FDIC subsequently accepted this offer in principle.

On April 27, 1987, Wade notified Gray that if Gray did not pay off the note by such date, the FDIC would transfer its remaining rights to Carter on April 30, 1987 and that a public sale would take place on May 1, 1987. On April 29, 1987, Carter sent the collateral to Phillips at the FDIC to be held in escrow and to be delivered to Gray if Gray paid by April 30, 1987, and for the collateral to be delivered to Carter or Phelps if Gray did not pay by April 30, 1987.

On April 30, Gray requested a one-day extension from the FDIC because of difficulty in obtaining the money by Federal Express before May 1, which the FDIC refused. The FDIC thereupon endorsed the note and assigned the security interest in the collateral to Carter on April 30, 1987, and also delivered the collateral held in escrow to him. There was no public sale of the collateral on May 1, 1987. Gray and Phelps continued to negotiate concerning the sale of the collateral. Phelps scheduled the public sale for May 11, 1987 and sent appropriate notices.

On May 5, 1987, Gray's attorney wrote a letter to Phelps wherein he offered to

tender the principal and interest due under the note and enclosed copies of cashier's checks as evidence of good faith. An offer was also made in the letter to pay $3,000.00 as reasonable expenses to Carter for the retaking, holding and preparing of the collateral for sale. On May 7, 1987, Phelps rejected Gray's $3,000.00 offer and enclosed statements regarding the services and expenses incurred in the matter.

On May 8, 1987, Gray filed suit to enjoin the May 11th sale, and sought a determination of his rights to redeem the collateral pursuant to 12A O.S.1981, § 9–506. In his petition, Gray tendered payment of the full amount of the note in addition to $3,000.00 in attorney fees and expenses to Carter, which Gray alleged was sufficient remuneration for Carter under Section 9–506. The trial court issued a temporary restraining order prohibiting the sale of the collateral pending a hearing on Gray's petition for a temporary and permanent injunction.

In Carter's answer, he denied the reasonableness of Gray's tender for expenses and alleged that his expenses were $43,276.74 from January 30, 1987, when Phelps tendered payment to the FDIC on Carter's behalf. Carter subsequently accepted Gray's tender of the principal and interest due on the note, but refused Gray's tender for expenses. Gray thereupon objected to Carter's partial acceptance of the tender. The trial court ordered Gray to pay the principal and interest into court and left the issue of Carter's reasonable expenses for determination at trial. Gray paid the sum of $157,276.35 into court on August 12, 1987.

Upon hearing, the trial court granted judgment in favor of Gray and awarded attorney fees to Gray as the prevailing party. The trial court issued findings of fact and conclusions of law in which it concluded as a matter of law that Carter did not become a holder of the promissory note until April 30, 1987, and therefore had no right to require payment of the note by Gray prior to April 30, 1987. The court further found that Carter's $22,853.00 claim for expenses prior to the institution of the litigation was incurred in an attempt

to obtain the note from the FDIC and as such, was not an expense, "reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and, to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses," citing 12A O.S.1981, § 9–506. The trial court determined that a reasonable attorney fee incurred by Carter after he became a holder of the note until the time Gray tendered the principal, interest, attorney fees and expenses attributable to the note and collateral was $3,000.00, and awarded same to Carter. The trial court also awarded Carter the amount previously paid into court by Gray.

■ On appeal, Carter contends the trial court erred in finding that Carter did not become a secured party until April 30, 1987. He asserts that the undisputed facts show Carter became the secured party and holder of the note on January 30, 1987 when he paid the FDIC for the promissory note, thus entitling Carter to recovery of his expenses from January 30, 1987.

The interpretation of the language of Section 9–506 appears to be one of first impression in Oklahoma. Section 9–506 provides:

> At any time before the secured party has disposed of collateral or entered into a contract for its disposition under Section 9–504 or before the obligation has been discharged under Section 9–505(2) the debtor or any other secured party may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the *expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and, to the extent provided in the agreement and not prohibited by law, his reasonable attorneys' fees and legal expenses.*" (Emphasis added)

Pursuant to 12A O.S. Supp.1984 § 9–105(1)(m), a "secured party" is defined as follows:

"Secured Party" means a lender, seller or other person in whose favor there is a security interest, including a person to whom accounts or chattel paper have been sold. When the holders of obligations issued under an indenture of trust, equipment trust agreement or the like are represented by a trustee or other person, the representative is the secured party.

Furthermore, a "holder" is defined under Section 1–201(20) of the Uniform Commercial Code (the Code) as, "a person who is in possession of a document of title or an instrument or a certificated investment security drawn, issued, or endorsed to him, or to his order or to bearer or in blank".

We determine that under the above definitions, Carter was not a secured party within the meaning of Section 9–506 prior to April 30, 1987. The evidence shows that the FDIC clearly did not consider Carter as such upon its realization that Phelps did not represent Gray. Furthermore, at no time did Phelps or Carter obtain physical possession of the promissory note or the security agreement prior to April 30, 1987. Carter asserts that he became the "transferee" of the note by virtue of 12A O.S. 1981 § 3–603(2) which provides:

"Payment or satisfaction may be made *with the consent of the holder,* by any person including a stranger to the instrument. *Surrender of the instrument,* to such a person gives him the rights of a transferee (Section 3–201)." (Emphasis added)

The FDIC as the "holder" did not inevitably consent to Carter's purchase of the note and did not surrender possession of the note to him.

■ Carter further contends that although he was not in physical possession of the note, he was in constructive possession of it. We are mindful of the case law recognizing constructive possession. See *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 452 F.Supp. 1108, 1117–1118 (S.D.N.Y.1978); *Russell v. Maxson Sales Co.,* 591 P.2d 703, 706–707 (Okl. 1979); *Scheid v. Shields,* 269 Or. 236, 524 P.2d 1209, 1210 (1974); *Billingsley v. Kel-*

*ly,* 261 Md. 116, 274 A.2d 113, 117–119 (App.1971).

However, as was stated in *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* supra at 1117:

"The essential ingredient of a constructive delivery is that it be made with the *unmistakable intention of transferring title to the instrument."* (Emphasis added)

There was no intention of transferring title in the instant case in order to constitute constructive possession. *Russell v. Maxson Sales Corp.,* supra.

In *Russell,* our Supreme Court discussed the problems arising from recognition of one not in possession of an instrument as the holder as follows:

If we were to rule that one not in possession of an instrument were the holder, an inordinate burden would be put upon drawers, makers and acceptors of negotiable instruments, for they would be required to ascertain who the holder of a particular instrument was prior to payment or satisfaction. Otherwise, these makers, drawers or acceptors would run the risk of paying a party in possession of the instrument who presented it for payment, but who, in fact, was not the holder, and therefore would not have the power to discharge the instrument.

To avoid such difficulty, the drafters of the Code provided that in order to be a holder one must have possession of an instrument. One of the underlying purposes and policies of the Uniform Commercial Code, as set forth at 12A O.S. 1971, § 1–201, is to simplify, clarify and modernize the laws governing commercial transactions. That Section also provides that the Code shall be liberally construed and applied to promote its underlying purposes and policies. To hold that one not in possession of an instrument were its holder would clearly not simplify commercial transactions, but would, as shown above, create virtual chaos in the commercial world. This being so, we cannot accept Livestock's argument that they were the holder of the

instrument, although they never had possession of the same.

591 P.2d at 706.

■ Section 9–506 encompasses only those situations involving the debtor and the secured party. Without physical possession of the promissory note or any intent of the FDIC to transfer possession constructively, Carter cannot be reimbursed under Section 9–506 for any expenses or attorney fees incurred prior to becoming a secured party. Thus, we need not address the issue of whether Carter's expenses and attorney fees from January 30, 1987 until April 30, 1987 fall within the class of expenses recoverable under Section 9–506.

Gray's motion for appellate attorney fees and costs is hereby DENIED. Both parties shall pay their appellate attorney fees and costs. The trial court's judgment is hereby AFFIRMED.

HUNTER, V.C.J., and MacGUIGAN, J., concur.