CORPORACION VENEZOLANA de FOMENTO, Plaintiff-Appellant,

v.

VINTERO SALES CORPORATION, Vintero Corporation, The Merban Corp., Defendants-Appellees,

Security Pacific International Bank, Defendant,

Vincent A. De Lyra, Robert J. Redmond, and James E. Himoff, Defendants-Appellees,

and

Canadian Imperial Bank of Commerce, The Royal Bank of Canada International Limited, Banque Canadienne Nationale, Banque Provinciale, LaSalle National Bank, and American Security and Trust Company, Intervening Defendants,

v.

VENEZOLANA DE CRUCEROS DEL CARIBE, C. A., Additional Defendant on the Counterclaim by Intervening Defendants,

and

Merban International, Incorporated, Additional Defendant on the Second Crossclaim by Intervening Defendants.

No. 835, Docket 79–7730.

United States Court of Appeals, Second Circuit.

Argued March 19, 1980.

Decided July 28, 1980.

**13.** See note 6 supra and accompanying text.

Sirius C. Cook, New York City (Healy & Baillie, Nicholas J. Healy, John P. O'Donnell, New York City, of counsel), for plaintiff-appellant, Corporacion Venezolana de Fomento.

David Hartfield, Jr., New York City (White & Case, Allan L. Gropper, Harry G. Barlow, Paskus, Gordon & Hyman, New York City, Robert R. Slaughter, New York City, of counsel), for defendants-appellees, The Merban Corporation, Robert J. Redmond and James E. Himoff.

Anthony Limitone, Jr., New York City (Thacher, Proffitt & Wood, Edward C. Kalaidjian, New York City, of counsel), for defendants-appellees, Vintero Sales Corporation, Vintero Corporation and Vincent A. DeLyra.

Before LUMBARD, MULLIGAN and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

This appeal presents a complex of legal issues arising out of the default by Venezolana de Cruceros del Caribe, C.A. ("Cariven"), a Venezuelan corporation, on notes issued by it and guaranteed by Corporacion Venezolana de Fomento ("CVF"), a Venezuelan governmental entity, and purchased by The Merban Corporation ("Merban"), a Swiss corporation, and later resold in part to various United States and Canadian banks, who became intervenors in this action. CVF alleged in its complaint filed in the Southern District of New York that the guarantees were void both because CVF had never approved them and because CVF had been fraudulently induced to guarantee the notes by Vintero Sales Corporation and Vintero Corporation, both New York corporations, by Vincent A. DeLyra, a United States citizen and principal in the Vintero companies (all parties to this action, and hereinafter collectively described as "the DeLyra interests"), and by Merban and several of Merban's officers. CVF appeals from the decision of the district court, Sweet, J., rejecting CVF's claims of non-approval and fraud, rendering judgment for Merban on its counterclaims to recover on the guarantees, No. 76–1671 (S.D.N.Y., Feb. 13, 1979), and from the district court's supplemental opinion finding that it had subject matter jurisdiction, 477 F.Supp. 615 (S.D.N.Y.1979). We affirm this portion of the district court's decision, but reverse and remand insofar as the judgment and opinion below absolves the DeLyra interests of actionable fraud.[1]

In 1974, Cariven sought from CVF—a Venezuelan state agency charged with stimulating economic enterprise—a guarantee for notes it intended to issue in order to finance its first business venture, the purchase and outfitting of two vessels as cruise ships. Cariven's stock was held by two Venezuelan nominees, and the district court found that DeLyra was the "49% owner of the corporation" (along with an associate named Gascue, who is not a party to this litigation) and that DeLyra "consider[ed] himself a joint venturer or perhaps an undisclosed principal in Cariven." Cariven had no appreciable assets and its principals had no experience running a cruise line.

---

1. A full statement of the facts in this case can be found in *Corporacion Venezolana de Fomento v. Vintero Sales*, 452 F.Supp. 1108 (S.D.N.Y. 1978), in which Judge Conner granted summary judgment in favor of the intervening purchasing banks. An appeal from this decision was settled by the parties after we remanded the case for a consideration of certain jurisdictional issues identical to those decided in this opinion, *CVF v. Vintero, et al.*, 607 F.2d 994 (2d Cir. 1979).

CVF was given the right to nominate two directors to seats on Cariven's board of directors early on in the course of financing negotiations.

Meanwhile, in 1975, as Cariven's arrangements for financing its purchases of the ships progressed, Vintero Sales Corporation bought two ships, the S.S. Santa Rosa and the S.S. Bahama Star. Vintero paid approximately $2 million for the two, most of this sum being money borrowed from Merban, in a loan not involved in this case.

Soon after, Cariven agreed to buy the two ships from Vintero at a combined price of approximately $17 million. The record reveals that although some money was expended by Vintero towards the refurbishing of the ships, less than a million dollars in such expenses was evidenced by receipts.[2]

By early 1975, the financing structure for Vintero's sale to Cariven was in place. Cariven issued and Merban bought two series of notes, one in April, 1975 and the second in October, 1975, each corresponding to one of the two ships to be bought from Vintero with the proceeds. Approximately $12 million of the notes were sold by Merban to various U.S. and Canadian banks ("the purchasing banks"). The money thus raised for Cariven was made available in the form of letters of credit at Security Pacific International Bank ("SPIB") made out in favor of Vintero, which was permitted to make drawdowns according to conditions incorporated in the Merban-Cariven Loan Agreement. Vintero collected about $8 million in this manner.

In April, 1976, Cariven defaulted on its interest payments to Merban and other holders of both series of its notes. No payments of principal or interest on either series have been made since October 30, 1975, when the first payments by Cariven were due.

In 1976, CVF brought suit in the Southern District of New York for a declaratory judgment against Merban and Vintero, seeking judicial nullification of its guarantees on the theory that Cariven had failed to comply with certain conditions precedent to the validity of the CVF guarantees.[3] The purchasing banks intervened and counterclaimed against CVF, and Judge Conner granted them summary judgment against CVF, at the same time denying summary judgment to Merban. 452 F.Supp. 1108 (S.D.N.Y.1978). The case was then transferred to Judge Sweet, who, after a bench trial on those issues left for resolution in light of Judge Conner's decision, entered judgment as described above. Subsequently, on June 27, 1979, this court remanded to Judge Sweet an appeal from Judge Conner's decision alleging lack of subject matter jurisdiction. The rulings by Judge Conner with respect to the purchasing banks were no longer in issue because a settlement had been reached between CVF and the purchasing banks. On September 20, 1979, Judge Sweet issued a second opinion, in which he found that jurisdiction existed under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611; and under the Edge Act, 12 U.S.C. § 632.

*Federal Jurisdiction*

The district court initially took jurisdiction on diversity grounds. But in its supplemental opinion on jurisdiction the district court recognized that this basis was insufficient under this circuit's case law.

---

**2.** In April, 1979, one of the two ships, the Bahama Star, was sold at a court-ordered auction for $332,000. As part of its Chapter XI proceedings, Vintero Corporation is presently asserting ownership of the other ship involved, the Santa Rosa, and an interest in the proceeds of the Bahama Star. S.D.N.Y. Docket No. 77–B 2687.

**3.** The six conditions precedent to the guarantee asserted by CVF were "(1) that the two ships to be purchased by Cariven have a capacity of 800 passengers each; (2) that a 'ship mortgage' ('prenda naval') on each ship in favor of [CVF] be acquired with funds obtained from the guarantees; (3) that the shareholders of Cariven increase the company's capital of the enterprise to the amount of the guarantee; (4) that the enterprise have available in cash not less than Bs. 2,000,000 (Venezuelan currency) for working capital; (5) that approvals for the transactions be obtained from the Ministry of Communications; and (6) that approvals for the transactions be obtained from the Comptroller General." 452 F.Supp. at 1113.

Both Merban, a Swiss corporation, and CVF, a Venezuelan corporation, are aliens. We have held that the presence of aliens on two sides of a case destroys diversity jurisdiction. *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975). Merban, however, has its principal place of business in New York, and since the 1958 amendment to the diversity statute, 28 U.S.C. § 1332(c), making corporations citizens of the states in which they have their principal place of business, in addition to the states in which they are incorporated, there has been a question as to whether or not alien corporations possess such dual citizenship. In our most recent comment on the subject, we suggested that alien corporations are not citizens of the state in which they have their principal place of business. *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, n. 5 (2d Cir. 1976). We need not reach the issue of whether or not 28 U.S.C. § 1332(c) applies to alien corporations, however, because it is enough in this case to hold that, even assuming such dual citizenship, the fact that alien parties were present on *both* sides would destroy complete diversity. *Hercules, Inc. v. Dynamic Export Corp.*, 71 F.R.D. 101 (S.D.N.Y.1976).

■ The district court reasoned that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611, supplied a basis for federal jurisdiction. We disagree.

The basic purpose of the Foreign Sovereign Immunities Act ("FSIA") is to give the district courts jurisdiction to hear civil cases involving claims against foreign states, and their instrumentalities, which have waived their immunity from suit with regard to the transaction involved. CVF is clearly the kind of governmental instrumentality against which such suits were contemplated, and there can be no gainsaying that this commercial transaction is one in which the government of Venezuela waived its immunity. The sole difficulty with the invocation of the FSIA as a basis for jurisdiction is CVF's argument that the Act was not meant to confer jurisdiction on cases pending at the time the Act became law.

CVF filed this action on April 9, 1976. The FSIA did not become effective until January 24, 1977. Pub.L. 94–583, § 8. Since that time a number of district courts have faced the issue of whether or not to apply the provisions of the Act retroactively. In *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849 (S.D.N.Y.1978), the court decided to apply the substantive principles of immunity embodied in the Act to a case filed before the effective date of the substantive criteria enacted by Congress. Other cases, unlike *Yessenin-Volpin*, have addressed the jurisdiction-conferring aspects of the Act, but in the context of removal statutes, which are construed strictly and involve the necessity of giving weight to the extent to which the action has progressed in the court where it was initially brought, *Martropico et al. v. [Pertamina]*, 428 F.Supp. 1035 (S.D.N.Y.1977); or in context of *in personam* jurisdiction, *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622 (S.D.N.Y. 1978); or in a context in which the presence of a grant of interim relief, such as attachment, brought into play the Congressional mandate to leave intact the *status quo ante* January 24, 1977 as respects rights of the parties. *Amoco Overseas Oil Co. v. Com. Nat. Algerienne de Navigation*, 459 F.Supp. 1242 (S.D.N.Y.1978), *aff'd* 605 F.2d 648; *National American Oil Corp. v. Federal Republic of Nigeria, supra.*

Thus no case in this circuit has squarely addressed the retroactive application of the provision conferring subject matter jurisdiction. The district court relied upon the language of the Act's Preamble which states that "henceforth" cases should be decided in accordance with the principles of the FSIA. But we read this to mean only that decisions made henceforth should be governed by the substantive principles of immunity law adopted in the Act. The Preamble does not purport to say anything about the retroactive application of the Act's subject matter jurisdiction provisions.[4]

---

4. In many cases a resolution of the substantive immunity law issues will be required in order to reach a decision on subject matter jurisdic-

tion, because 28 U.S.C. § 1330 is couched as follows:

This case, then, presents the situation which is the converse of *Ex parte McCardle*, 7 Wall. [74 U.S.] 506, 19 L.Ed. 264 (1869). In that case the question was whether or not Congress could withdraw jurisdiction from the district courts in pending cases. *See generally* Hart and Wechsler, "Further Note on the Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic," The Federal Courts and the Federal System (2d Ed.) at 330. Rarely will a court face the question whether or not Congress can *confer* jurisdiction in a pending case, since such a scenario supposes that the district court has taken jurisdiction on a mistaken theory. Such instances are not, however, unknown; and the same situation can be created when a change in the way a jurisdictional statute is interpreted threatens to oust the district courts of jurisdiction. In *Andrus v. Charlestone Stone Products*, 436 U.S. 604, 607, n.6, 98 S.Ct. 2002, 2005, 56 L.Ed.2d 570, 574 (1978), the Supreme Court held that a case heard by the district court under an incorrect theory of subject matter jurisdiction could be saved, in a jurisdictional sense, by passage, after the case was begun, of a statute whose effect was to vest the court with jurisdiction. The mechanism in *Andrus* was Congress' elimination of the amount in controversy requirement in suits against the United States or its officers. The Court held that this elimination created jurisdiction retroactively.

But in our view the *Andrus* principle is not broad enough to cover the case at bar. The *Andrus* Court relied on the "remedial purpose" of the elimination of the amount in controversy, and cited with approval a circuit court case in which the same result had been reached on the ground that the elimination of the requirement was a Congressional correction of a "lacuna". *Ralpho*

*v. Bell*, 569 F.2d 607, 615–16, n.51 (D.C. Cir. 1977).

Passage of the FSIA cannot be said to have remedied a "lacuna". Rather, the Act represented Congress' first codification of principles of sovereign immunity law. We need not reach the troubling question of whether or not Congress can confer jurisdiction in pending cases, and thus further undermine the principle that jurisdiction is determined at the time of commencement of suit, because we cannot agree with the district court's view that Congress intended such retroactivity in the case of the FSIA.

 We do find that the District Court had jurisdiction under the Edge Act, 12 U.S.C. § 632, which provides that

all suits of a civil nature . . . to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits . . . . .

Judge Sweet found that the presence in the case of the two intervening American purchasing banks, both federally chartered, sufficed to confer Edge Act jurisdiction. But he did not reach the question as to whether or not Merban's counterclaims against CVF, on which he ultimately gave judgment in favor of Merban, could be considered within the ancillary jurisdiction of the federal court assuming that Edge Act jurisdiction only was present, because in his view jurisdiction over all aspects of the action could also be predicated upon the FSIA. We are troubled by Judge Sweet's approach because the central provision of the jurisdictional grant quoted above is the

---

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in person- * am with respect to which the foreign state is not entitled to immunity either under sections 1605 1607 of this title or under any applicable international agreement.

Thus a court may have to interpret the substantive principles embodied in §§ 1605 -1607 before deciding whether to take jurisdiction. Since CVF has not claimed sovereign immunity in this case, no inquiry into whether or not the substantive principles of §§ 1605 1607 apply is necessary.

necessity that the transaction in question be one "arising out of . . . international or foreign banking." The "international" or "foreign" part of the sale of Cariven's notes was, in essence, a private placement with a financing firm, but not really a banking transaction because neither Cariven nor Merban, nor for that matter CVF, is a bank. Merban's sales of the notes to American and Canadian banks involved "foreign banking" only if a mere sale within the United States to a foreign purchaser (i. e., a Canadian bank) is "foreign banking" within the statute. And, in any event, the intervention by nationally chartered banks could not confer jurisdiction on that part of the case which consists of CVF's claims against Merban, or Merban's against CVF, because the rule that pleadings by intervenors may be treated as independent actions for jurisdictional purposes does not extend to giving the court ancillary jurisdiction over the other parties; or, put in a more familiar way, "intervention will not be permitted to breathe life into a 'nonexistent' law suit." *Fuller v. Volk*, 351 F.2d 323 (3d Cir. 1965).

■ There is, however, another possible basis for Edge Act jurisdiction. SPIB is a nationally chartered bank entitled to the protection offered by 12 U.S.C. § 632. But Judge Sweet thought that, as a mere stakeholder, SPIB was not exposed to any potential liability. Thus, in his view, its presence as a defendant was not sufficient to confer

jurisdiction. *Bata v. Central Penn Bank of Philadelphia*, 223 F.Supp. 91 (E.D.Pa.1963).[5] Judge Sweet relied on Judge Conner's statement that "the role of Chemical and Security Pacific [was] that of depository and collection agent." 452 F.Supp. at 1116. But Judge Conner's opinion dealt with the question of whether or not the purchasing banks were holders in due course under the U.C.C., and his discussion of the status of SPIB is limited to its role as custodian of the actual notes sold by Merban to the purchasing banks. SPIB played another role in the Cariven-Merban transaction—that of the provider of a letter of credit for Vintero's benefit on Cariven's account. SPIB was named in CVF's complaint as a defendant who, allegedly, had wrongfully allowed drawdowns by Vintero against the letter of credit—drawdowns which were wrongful because of Vintero's alleged failure to comply with what CVF said were conditions precedent on the money's availability binding on SPIB. CVF's complaint clearly viewed SPIB as potentially liable for damages. SPIB is a federally chartered bank, and the transaction in which Vintero, in New York, drew on a letter of credit on the account of a Venezuelan corporation, Cariven, was one involving "international or foreign banking." SPIB was thus a true party to the action, and jurisdiction inhered in the district court under 12 U.S.C. § 632.[6] The counterclaims by Merban and the claims by the intervenors were within the

**5.** The *Bata* case involved the construction of 12 U.S.C. § 632 insofar as it provides for removal of an action in which a federally chartered bank is a party, and because of the particular strictness with which removal statutes are construed we might not feel compelled to apply *Bata* to a case in which removal was not being sought. But because we cannot agree with the district court that SPIB was a mere stakeholder not threatened by liability we need not reach the question of *Bata's* applicability.

**6.** Although CVF did not allege Edge Act jurisdiction in its complaint, the existence of such jurisdiction appears from the facts alleged in the complaint. *See Harary v. Blumenthal*, 555 F.2d 1113, 1115 n.1 (2d Cir. 1977).

CVF's complaint alleged that SPIB was a New York corporation. In fact, as the district court found, 477 F.Supp. at 621, SPIB at the

time the complaint was filed was chartered under the laws of the United States. And courts look at "the record viewed in its collective significance," *Yonofsky v. Wernick*, 362 F.Supp. 1005, 1016 (S.D.N.Y.1973), to resolve matters of underlying jurisdictional issues. This is particularly true when the jurisdictional issue is one that, unlike, for example, domicile or amount in controversy, is a matter easily determined by documents and one as to which there will usually be an unequivocal answer. The evidence we rely on here is the same sort of evidence that would be considered in the form of affidavits and other papers if the district court had been presented with an FRCP Rule 12(b)(1) motion, a procedure we have approved. *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir. 1976).

district court's ancillary jurisdiction. This jurisdiction was not defeated when SPIB settled and was consensually dismissed from the case.

*Merban's Counterclaims Against CVF*

CVF appeals from Judge Sweet's grant of judgment on the merits in favor of Merban on the guarantees. We affirm.

■ CVF alleges that Cariven agreed to a series of conditions precedent to CVF's issuance of the guarantees, and that these conditions were not complied with. As Judge Conner correctly held in an earlier decision in this case, 452 F.Supp. 1108 (S.D. N.Y.1978), all but one of these purported conditions were, at most, side agreements between CVF and Cariven. With this one exception, they were not incorporated, directly or by reference, into the Cariven-Merban loan agreement. Merban is not bound by side agreements between Cariven and CVF, at least in the absence of any finding by the district court that Merban knew about such agreements. There is nothing in the nature of CVF's status as a governmental entity that should change this result. CVF argues that under Venezuelan law the CVF guarantees are a legal nullity. But if this contention is true, it is a matter for the Venezuelan authorities to take up with CVF, or for CVF to take up with Cariven in the courts of Venezuela. The validity of a guarantee relied upon in international commercial transactions cannot be governed solely by the internal public law of the guarantor's home country without reference to established principles of transnational commercial law.

The only ground asserted by CVF which could nullify the guarantees is the purported insufficiency of the approval of the Venezuelan Comptroller-General, because such approval is required by the terms of both Merban-Cariven loan agreements. Only one letter of approval from the Comptroller-General was in fact obtained. Judge Sweet reasoned that this document could satisfy the terms of both Loan Agreements, since it referred to "two ships."

■ Before determining whether or not Judge Sweet's conclusion was correct as a matter of law, we must determine what law to apply. So far as the first loan agreement is concerned, there is little problem. It contains a choice of law clause naming New York law as governing. Since there were considerable contacts with New York, we see no obstacle to giving effect to this clause. And since CVF makes no argument that the Comptroller-General's approval was insufficient under New York law, but rather argues only that it would be insufficient if Venezuelan law governed, we affirm Judge Sweet's conclusion that the terms of the first Loan Agreement were complied with and the guarantees issued pursuant to them were valid.

■ Analyzing the sufficiency of the Comptroller-General's approval of the second loan guarantee is more difficult, since the second Loan Agreement contains no choice-of-law provisions. Cariven, a Venezuelan corporation, borrowed money from a Swiss corporation with a principal place of business in New York. The notes were delivered to Merban in New York, and it was in New York that Merban paid to CVF the latter's commission on its guarantees. Although conflicting inferences could be drawn from the presence of the choice-of-law clause in the first Loan Agreement and its absence from in the second, there is nothing in the record to support the view that it was eliminated as a bargained-for matter. We conclude that the parties intended New York law to apply to the second loan agreement as well, and, as stated above, under New York law there seems to be no substantial doubt that the approval obtained from the Venezuelan Comptroller-General is sufficient to validate the guarantees made with respect to the second series of notes.

■ As an additional reason why Merban should not be awarded recovery on the CVF guarantees, appellants argue that the district court erred in finding that no fraud was committed on CVF in order to induce it to issue the guarantees, and in finding that Merban did not participate in such fraud.

We agree with the district court on the issue of Merban's participation. There is abundant evidence in the record to support its view that Merban's officers were unaware of DeLyra's machinations. The fact that DeLyra himself on occasion acted as a business locater for Merban is not sufficient to justify imputing any wrongdoing on his part to Merban, since his relationship to Merban was that of an independent agent. He was not a stockholder, officer or employee of Merban, and his actions, if fraudulent with respect to CVF, cannot be imputed to Merban.

But we do not see why the district court had to reach the question of whether or not DeLyra's involvement in the scheme constituted actionable fraud, and we vacate that portion of the district court's opinion which holds that no such fraud occurred because the element of reliance was missing from the transaction.[7] The fact that, as we have found, the Loan Agreements were complied with by Merban and that Merban did not participate in any fraud perpetrated upon CVF, is sufficient basis on which to affirm CVF's liability to Merban.

 Judge Sweet reasoned that CVF could not show reliance with respect to any fraud by DeLyra because (1) it had placed two CVF directors on Cariven's board, and thus had the opportunity to secure information independently on such matters as whether Cariven's principals had made the additional capital contributions required of them by agreements between CVF and Cariven; and (2) because CVF could not prove it had received letters from Cariven in which alleged misrepresentations were contained. We question whether Judge Sweet's interpretation of the New York law on reliance was correct. The fact that an entity is represented on a board of directors will not prove an absolute bar to proof of reliance when the controlling directors take steps to prevent the outside directors from exercising their normal functions of review and oversight. See *Frigitemp Corp. v. Financial Dynamics Fund*, 524 F.2d 275 (2d Cir. 1975).

 But the ground for our reversal is that Judge Sweet applied the wrong law. Certain aspects of this transaction, such as the sufficiency of the Comptroller General's approval, are governed by New York law. This does not mean, as the district court apparently assumed, that New York law governs related issues, such as CVF's allegation that it was defrauded by the DeLyra interests. Using the choice of law technique of *depecage*,[8] a court may—and in this case we think should have—separated this part of this case into two different portions for choice of law purposes. The first portion is the question of what law to apply to the question of the sufficiency of the Comptroller General's telegram as an approval under the Loan Agreements. Since there are enough contacts with New York to validate the parties' choice of New York law as governing under any choice of law analysis, we need not reach the question of what jurisdiction's law would be applied if a serious challenge to the parties'

---

7. It may be that, in addition to dealing with CVF's claim that it was not liable on the guarantees because of Merban's involvement with the DeLyra interests in the alleged fraud, the district court thought it had to reach the question of fraud in order to rule on CVF's claim that it was entitled to an indemnity from Cariven's stockholders. The agreement between CVF and Cariven providing for such an indemnity ran against Cariven's stockholders, who were mere nominees. In light of the district court's finding that DeLyra was a principal or joint venturer in Cariven, it is possible that DeLyra might be liable under the indemnity agreement. To the extent the district court's decision below purports to foreclose such liability, which is unclear, it is reversed.

8. "Depecage occurs where the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate the other issues. The technique permits a more nuanced handling of certain multistate situations and thus forwards the policy of aptness. *See generally* Reese, Depecage: A Common Phenomenon in Choice of Law, 73 Colum. L.Rev. 58 (1973)." Von Mehren, Special Substantive Rules for Multistate Problems: Their Role and Significance in Contemporary Choice of Law Methodology, 88 Harv.L.Rev. 347 (1974). *See also Pearson v. Northeast Airlines, Inc.*, 309 F.2d 553 (2d Cir. 1962) (en banc).

ability to choose New York law could be mounted. Analysis is more difficult with respect to choice of law for the CVF-DeLyra fraud issues. Were this a diversity case, *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), would require that we look to the choice of law doctrines of the forum state. This is a federal question case, however, and it is appropriate that we apply a federal common law choice of law rule in order to decide which of the concerned jurisdiction's substantive law of fraud (*i. e.*, that of New York or that of Venezuela) should govern. The use of federal common law in specialized areas where jurisdiction is not based on diversity has been sanctioned by the Supreme Court since the day *Erie* was decided, *see Hinderlider v. LaPlata River Co.,* 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202 (1938); and the availability of a federal choice of law rule in a case like this, where jurisdiction is based on a statute meant to give a federal forum to nationally chartered banks, is supported by *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

In this case we think that the question of whether or not CVF was defrauded by the DeLyra interests is one best resolved under Venezuelan law. Unlike the validity of the guarantees, the resolution of this question has no repercussions in the world of international commercial transactions. It involves no choice of law decision made by the parties. Instead, it calls for a determination whether or not a Venezuelan corporation, Cariven (or its two principals, one of whom, Gascue, is Venezuelan) defrauded a second Venezuelan corporation, CVF, in Venezuela. The alleged fraud, moreover, concerned acts that were to take place in Venezuela and be of Venezuelan legal significance (*e. g.*, the increased capital contributions, the Ministry of Communications approval, and the securing of a "prenda naval", a civil law ship mortgage). Such allegations, in our view, should be evaluated under Venezuelan rather than New York law.

Because the district court thought that the fraud claim against the DeLyra interests was governed by New York law insofar as CVF sought to impose liability on the DeLyra interests in addition to negativing CVF's guarantees, the district court did not resolve certain questions of fact and law (such as DeLyra's possible personal liability under the CVF-Cariven indemnity contract, *see* n. 7 *supra*, and the sufficiency of proof of fraud under Venezuelan law). Accordingly, we direct a remand for the consideration of these and other issues connected with the resolution of CVF's claim of fraud against the DeLyra interests.

Affirmed in part, reversed in part, and remanded.