Yasushi ARAI and Japan Extensive
Consulting Office Co., Ltd.,
Plaintiffs,

v.

Shigeyuki TACHIBANA, Hawaiian
International Sporting Club, Inc.,
and Toshio Masuda, Defendants.

Civ. No. 91–00422 DAE.

United States District Court,
D. Hawaii.

Nov. 21, 1991.

McCorriston Miho & Miller, Stephen M. Okano, Jerrold Y. Chun, Lisa M. Ginoza, Honolulu, Hawaii, for plaintiffs.

Gilbert & Jeynes, Davor Z. Pevec, Robert Carson Godbey, Honolulu, Hawaii, for Toshio Masuda.

Gallup & Van Pernis, Mark Van Pernis, Gary W. Vancil, Kailua–Kona, Hawaii, for defendants.

Case & Lynch, Valta A. Cook, Diana L. Van De Car, Ivan M. Torigoe, Hilo, Hawaii, for Shigeyuki Tachibana.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

DAVID A. EZRA, District Judge.

This court heard defendants' motions to dismiss on October 21, 1991. Appearances were made by Mark J. Bennett, Esq. and Jerrold Y. Chun, Esq. on behalf of plaintiffs; Mark Van Pernis, Esq. on behalf of defendant Hawaiian International Sporting Club, Inc.; Nenad Krek, Esq. on behalf of defendant Shigeyuki Tachibana; and Davor Z. Pevec, Esq. and Robert C. Godbey, Esq. on behalf of Toshio Masuda. After reviewing the motions and the supporting and opposing memoranda and hearing oral arguments, the court GRANTS defendants' motions to dismiss.

## BACKGROUND

Plaintiff Japan Extensive Consulting Office Co., Ltd. ("Japan ECO") is a Japanese corporation. Plaintiff Yasushi Arai ("Arai") is a citizen of Japan and the majority shareholder of Japan ECO. Defendant Hawaiian International Sporting Club, Inc. ("HISC") is a Hawaii corporation doing business in the State of Hawaii. Defendants Shigeyuki Tachibana ("Tachibana") and Toshio Masuda ("Masuda") are Japanese citizens admitted to permanent residency in the United States and domiciled in the State of Hawaii. Katsuhiko Onishi, Hidenori Onishi, Takio Takahashi, and Takumi Hirai (collectively the "Former Shareholders") are all non-party, Japanese citizens who participated in the contracts in dispute.

On October 19, 1990, Japan ECO entered into a Stock Purchase Agreement ("SPA") with Tachibana and the Former Shareholders whereby Japan ECO would purchase 96,000 shares of HISC common stock. HISC's major asset is the Volcano Golf Course located on the island of Hawaii. Japan ECO has paid $1,021,982.10 to Tachibana and the Former Shareholders pursuant to the SPA. Pursuant to another Stock Purchase Agreement ("Transfer Agreement"), dated April 17, 1991, Tachibana purchased the remaining interests of the Former Shareholders in HISC.

On April 25, 1991, Arai, Japan ECO, Tachibana, Masuda, and HISC entered into a separate Stock Purchase and Promotion Agreement ("Agreement"). This Agreement is the primary contract in dispute in this case. Pursuant to the Agreement, Tachibana agreed to sell 91,200 shares of HISC to Arai and Masuda in return for:

(1) Japan ECO's release of the $1,021,-982.10 paid pursuant to the SPA;

(2) 300 million yen to be paid upon execution of the Agreement;

(3) 200 million yen to be paid on May 15, 1991; and

(4) 2,800 million yen payable in ten bimonthly equal installments.

Under the Agreement, Japan ECO agreed to assign all of its interest in the SPA to Arai and Masuda. Also pursuant to the Agreement, HISC authorized Tachibana, Arai, and Masuda to incorporate the Japan Volcano Golf and Country Club, Inc. ("Japan Corporation") in Japan to sell golf memberships in Japan in a golf club that would use the Volcano Golf Course. In accordance with the Agreement, Japan ECO released the $1,021,982.10 to Tachibana, and Arai made timely payments of 300 million and 200 million yen to Tachibana on April 25 and May 15, 1991.

On June 12, 1991, Tachibana's attorney purportedly sent a letter to Arai alleging that Arai and Masuda had breached the Agreement and that the Agreement would

be terminated on June 27, 1991 unless Arai and Japan ECO cured their breach by that date. On June 15, 1991, the Japan Corporation allegedly held a special shareholders' meeting which was attended by Tachibana and Masuda. Pursuant to actions taken at the meeting, Tachibana and Masuda dissolved the Japan Corporation on June 24, 1991. As a result, Arai alleges that he was prevented from fulfilling and curing his breaches, if any, under the Agreement.

On July 24, 1991, Japan ECO and Arai filed this action against Tachibana, HISC, and Masuda alleging that Tachibana and Masuda induced them to enter into the Agreement for the purpose of defrauding them of the $1,021,982.10 and the 500 million yen. Plaintiffs also contend that the breaches of the Agreement alleged by Tachibana were induced and orchestrated by Tachibana and Masuda. Plaintiffs assert claims for breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, tortious interference with prospective advantage, fraud, securities fraud, conspiracy, and unjust enrichment. Plaintiffs seek declaratory relief, injunctive relief, compensatory damages, punitive damages, rescission of the Agreement, restitution, and attorneys' fees and costs.

On August 15, 1991, HISC filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). This motion was followed by Masuda's and Tachibana's motions to dismiss on August 30, 1991 and September 20, 1991. Generally, defendants allege that this court does not have subject matter jurisdiction over this case because there is no complete diversity of citizenship of the parties as required by 28 U.S.C. § 1332.

More specifically, defendants contend that dismissal is appropriate because complete diversity is destroyed on the following grounds:

(1) Defendant Masuda, a resident of Hawaii, should be realigned as a party plaintiff;

(2) Plaintiff Japan ECO possesses dual citizenship in Japan and Hawaii;

(3) The Former Shareholders, who are all Japanese citizens, are indispensable defendants; and

(4) Defendants Tachibana and Masuda are Japanese citizens.[1]

In addition, as an alternative ground for dismissal, Tachibana asserts that if the court does not dismiss for lack of diversity, then it should abstain from exercising its jurisdiction pursuant to *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

## DISCUSSION

This is a case of first impression. The principal question to be resolved by this motion is whether there exists complete diversity of citizenship of the parties pursuant to the federal diversity jurisdiction statute.[2] Plaintiffs contend that a recent amendment to the federal diversity statute abrogates the previous rule which denied alienage jurisdiction in cases involving both alien plaintiffs and alien defendants. Because this court finds that defendants Tachibana and Masuda are Japanese citizens who destroy the complete diversity of parties required for alienage jurisdiction, the court does not address defendants' other grounds for dismissal.

### I. *General Principles of Alienage Jurisdiction*

■ Section 2 of Article III of the United States Constitution provides in part that the judicial power of the United States shall extend to controversies "between a

---

**1.** These four reasons for lack of complete diversity were set forth in HISC's memorandum in support of its motion to dismiss. In Masuda's memorandum in support, Masuda joined in, and incorporated by reference, all of HISC's memorandum with the exception of the argument that Masuda should be realigned as a party plaintiff. Tachibana incorporated all of HISC's arguments and added the abstention argument.

**2.** The federal diversity jurisdiction statute, 28 U.S.C. § 1332, encompasses several different types of jurisdiction, including alienage jurisdiction, which are sometimes collectively referred to as diversity jurisdiction.

State, or the Citizens thereof, and foreign States, Citizens or Subjects." This type of federal jurisdiction is commonly referred to as "alienage jurisdiction." One of the fundamental principles of alienage jurisdiction is that the federal judicial power cannot extend to cases involving solely aliens. *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 3 L.Ed. 108 (1809).

■ Article III requires only minimal diversity among parties to support diversity or alienage jurisdiction. *See State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 531, 87 S.Ct. 1199, 1203, 18 L.Ed.2d 270 (1967) (Article III requires only minimal diversity for diversity jurisdiction); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 492 n. 18, 103 S.Ct. 1962, 1970 n. 18, 76 L.Ed.2d 81 (1983) (implying that the Constitution only requires minimal diversity for alienage jurisdiction); 1 James W. Moore et al., *Moore's Federal Practice* ¶ 0.75[1.–2–3] (2d ed. 1991) (Constitution requires only minimal diversity for alienage jurisdiction). Minimal diversity requires that there be at least one plaintiff and one defendant in the case whose citizenships are diverse; there can be other plaintiffs or defendants in the case which do not meet this jurisdictional criteria. Therefore, alienage jurisdiction is constitutionally permissible as long as there is at least one alien party and at least one state or citizen of a state opposing the alien.

■ Whereas Article III requires only minimal diversity between parties to support diversity jurisdiction, the federal diversity jurisdiction statute requires complete diversity between parties[3]—there must be diversity of citizenship between every plaintiff and every defendant.[4] 28 U.S.C. § 1332(a) (Supp.1991). *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373–74, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274

(1978); *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). The following court of appeals decisions have extended the complete diversity requirement to alienage jurisdiction. *Faysound Ltd. v. United Coconut Chems.*, 878 F.2d 290, 294 (9th Cir.1989) (citing *Cheng v. Boeing Co.*, 708 F.2d 1406, 1412 (9th Cir.1983), *cert. denied*, 464 U.S. 1017, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983)); *Eze v. Yellow Cab Co. of Alexandria, Va.*, 782 F.2d 1064, 1065 (D.C.Cir.1986); *Giannakos v. M/V Bravo Trader*, 762 F.2d 1295, 1298 (5th Cir.1985); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 789–90 (2d Cir.1980), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *Field v. Volkswagenwerk AG*, 626 F.2d 293, 296 (3d Cir.1980).

## II. *The 1988 Amendment To The Federal Diversity Jurisdiction Statute*

In 1988, Congress enacted the Judicial Improvements and Access to Justice Act ("Judicial Improvements Act"). Pub.L. No. 100–702, 102 Stat. 4642 (1988). One of the primary problems that the Act was designed to address was the "delay caused by rising caseloads." House Judiciary Committee, Judicial Improvements and Access to Justice Act of 1988, H.Rep. No. 889, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 5982, 5984 [hereinafter Legislative History]. Among other solutions to this problem, the Judicial Improvements Act sought to lessen the federal caseload by reducing diversity jurisdiction. The original version of the Act would have eliminated virtually all diversity jurisdiction. Legislative History at 5985–86. Of the several changes to the diversity statute, the most significant modification was raising the jurisdictional amount in controversy from $10,000 to $50,000. This change

---

**3.** Because the complete diversity rule is mandated by statute and not the Constitution, Congress can waive the complete diversity rule, and has done so in limited situations. *See State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 530–31, 87 S.Ct. 1199, 1203, 18 L.Ed.2d 270 (1967) (only minimal diversity required for federal interpleader action).

**4.** Alienage jurisdiction's requirement of complete diversity is defeated if there are alien plaintiffs and alien defendants. However, 28 U.S.C. § 1332(a)(3) grants jurisdiction in actions where the controversy is between "citizens of different States and in which citizens or subjects of a foreign state are additional parties." This type of jurisdiction is a distinct form of "diversity" jurisdiction, not "alienage" jurisdiction.

alone would allegedly reduce the federal diversity caseload by up to 40%. Legislative History at 6006.

Another change to the diversity statute which was enacted to reduce federal jurisdiction was the addition of a provision pertaining to aliens who are permanently residing in the United States. This new provision states:

> For the purposes of [section 1332], an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.

28 U.S.C. § 1332(a) (Supp.1991).[5] This provision became effective on May 18, 1989.

Unfortunately the alien permanent resident provision of the Judicial Improvements Act was hastily added late in the legislative process and there is very little legislative history pertaining to this specific provision.[6] The legislative history of the Judicial Improvements Act was written pri-

or to the inclusion of the alien permanent resident provision in the bill which was enacted. The only discussion of the alien permanent resident provision appears in the Congressional Record on the day the Senate considered and passed the final version of the bill which was to become the Act. The sponsor of the Senate version of the bill, Senator Howell Heflin, provided the following commentary:

> [The federal diversity jurisdiction statute] currently gives the district courts diversity jurisdiction over actions between citizens of a State and citizens or subjects of a foreign state. Diversity jurisdiction exists under this provision even though the alien may have been admitted to the United States as a permanent resident. As any review of the immigration statistics indicates, large numbers of persons fall within this category.

---

5. In its entirety, section 1332(a) provides:

    (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between—

    (1) citizens of different states;

    (2) citizens of a State and citizens or subjects of a foreign state;

    (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

    (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

    *For the purposes of this section, section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.*

    28 U.S.C. § 1332(a) (Supp.1991) (emphasis added).

6. The original version of the bill which was to become the Judicial Improvements Act was House of Representatives Bill No. 3152 ("H.R. 3152"), introduced on August 6, 1987. H.R. 3152 did not contain the alien permanent resident provision. On June 14, 1988, an amended version of H.R. 3152 was reintroduced as a "clean bill," H.R. 4807. H.R. 4807 also did not contain the alien permanent resident provision. A statement of the legislative history of the Judicial Improvements Act up to August 26, 1988 is contained in House Report No. 100–889.

    While the House was considering H.R. 4807, the Senate had been entertaining a similar bill, Senate Bill No. 1482 ("S. 1487"), which was

introduced on June 23, 1987 by Senator Howell Heflin, the Chairman of the Subcommittee on Courts and Administrative Practice of the Committee on the Judiciary, United States Senate. The original version of S. 1482 did not contain the alien permanent resident provision. At some point in 1988, the alien permanent resident provision was added to S. 1482 based on *the recommendation of the Judicial Conference of the United States. See Reports of the Proceedings of the Judicial Conference of the United States* 76–77 (September 14, 1988).

On September 13, 1988, the House of Representatives passed H.R. 4807. After the House passed H.R. 4807, the Senate altered the text of H.R. 4807 to conform with S. 1482. On October 14, 1988, the Senate considered and passed the amended version of H.R. 4807. On October 19, 1988, the House passed the amended H.R. 4807. On November 19, 1988, this amended version of H.R. 4807 was enacted as the Judicial Improvements Act.

The first mention of the alien permanent resident provision appeared in the Congressional Record on October 14, 1988. The alien permanent resident provision surfaced as section 203 of S. 1482. Due to the limited time remaining in the session of Congress, there was no Senate committee report accompanying S. 1482.

For more information on the legislative development of the Judicial Improvements Act and the alien permanent resident provision, see John B. Oakley, *Recent Statutory Changes in the Law of Federal Jurisdiction and Venue,* 24 U.C. Davis L.Rev. 735, 736 n. 1, 742 n. 14 (1991).

*There is no apparent reason why actions between persons who are permanent residents of the same State should be heard by Federal courts merely because one of them remains a citizen or subject of a foreign state.*

134 Cong.Rec. 31,055 (October 14, 1988) (emphasis added).

The underlined portion of this commentary indicates that the alien permanent resident provision was intended to eliminate suits between a citizen of State A and an alien permanently residing in State A. There is no evidence that Congress enacted the provision for any other purpose.[7] Commentators agree that the elimination of suits between a citizen of a state and an alien permanently residing in that same state was the sole impetus behind the alien permanent resident provision. *See* 1 James W. Moore et al., *Moore's Federal Practice* ¶ 0.75[1.–5] (2d ed.1991); 13B Charles A. Wright et al., *Federal Practice and Procedure* § 3604 (Supp.1991).[8]

In addition to the alien permanent resident provision's intended purpose, the provision seemingly authorizes federal diversity or alienage jurisdiction in certain cases in which federal jurisdiction did not exist prior to the amendment in 1988. The following examples may help illustrate the state of the law regarding alienage jurisdiction before and after the addition of the alien permanent resident provision in the 1988 amendment:

(1) *Citizen of State A v. Alien (nonresident)*

Before: constitutional and authorized under § 1332(a)(2)

After: same

(2) *Citizen of State A v. Alien (permanent resident of State A)*

Before: constitutional and authorized under § 1332(a)(2)

After: constitutional, but prohibited by the alien permanent resident provision; this is the situation which Congress intended to eliminate

(3) *Citizen of State A and Alien (nonresident) v. Alien (nonresident)*

Before: constitutional, but no statutory authorization

After: same

(4) *Citizen of State A and Alien (permanent resident of State A) v. Alien (nonresident)*

Before: constitutional, but no statutory authorization

After: the circumstances of this case

(5) *Alien (nonresident) v. Alien (nonresident)*

Before: unconstitutional and no statutory authorization

After: same

(6) *Alien (permanent resident of State A) v. Alien (nonresident)*

Before: unconstitutional and no statutory authorization

After: unconstitutional, but seemingly authorized by the alien permanent resident provision

(7) *Alien (permanent resident of State A) v. Alien (permanent resident of State B)*

Before: unconstitutional and no statutory authorization

After: unconstitutional, but seemingly authorized by the alien permanent resident provision

With respect to examples (4), (6), and (7) above, the plain language of the alien permanent resident provision seems to grant jurisdiction even though no such jurisdiction existed prior to the amendment in 1988. The problem with these three examples is that they are not encompassed by the congressional intent behind the alien

---

**7.** Rather than redefining the jurisdictional status of aliens permanently residing in the United States, Congress could have achieved its legislative objective by simply adding a provision to the diversity statute which stated that alienage jurisdiction does not extend to cases in which a citizen of a state and an alien permanently residing in that same state are opposing parties. *See* John B. Oakley, *Recent Statutory Changes in the Law of Federal Jurisdiction and Venue,* 24 U.C. Davis L.Rev. 735, 742 n. 15 (1991).

**8.** *See also* Courtney J. Linn, *Diversity Jurisdiction and Permanent Resident Aliens,* 38 Fed. Bar News & J. 284, 284 (1991); John B. Oakley, *Recent Statutory Changes in the Law of Federal Jurisdiction and Venue,* 24 U.C. Davis L.Rev. 735, 741–45 (1991).

permanent resident provision. Furthermore, because Article III does not grant federal court jurisdiction to actions wholly between aliens, examples (6) and (7) are most likely unconstitutional.

■ For alienage jurisdiction, Article III requires that at least one of the parties must be a state or a citizen of a state. One cannot be a citizen of a state without first being a citizen of the United States. *See Lew v. Moss*, 797 F.2d 747, 749 (9th Cir. 1986). Certainly the diversity statute amendment does not confer United States citizenship to alien permanent residents who are parties to federal court litigation. Thus, the amendment purports to give aliens a status they cannot have.

Although no federal court has addressed the literal yet probably unconstitutional applications of the alien permanent resident provision, commentators generally agree that any interpretation of the provision which would provide federal jurisdiction to a case involving solely aliens would be unconstitutional. *See* 1 James W. Moore et al., *Moore's Federal Practice* ¶¶ 0.74[2.–1], 0.75[1.–2–2], [1.–5] (2d ed.1991); 13B Charles A. Wright et al., *Federal Practice and Procedure* § 3604 (Supp.1991); *see also* Larry Kramer, *Diversity Jurisdiction*, 1990 B.Y.U. L.Rev. 97, 122 (1990); Courtney J. Linn, *Diversity Jurisdiction and Permanent Resident Aliens*, 38 Fed. Bar News & J. 284 (1991); John B. Oakley, *Recent Statutory Changes in the Law of Federal Jurisdiction and Venue*, 24 U.C. Davis L.Rev. 735, 741–45 (1991). *But see* William VanDercreek, *From the Judiciary Act of 1789 to the Judicial Improvements Act of 1989*, 14 Okla. City U.L.Rev. 565, 595–97 (1989).

Closely related to the unconstitutional applications of the alien permanent resident provision, the issue in the present case is whether the amendment alters the requirement of complete diversity for alienage jurisdiction. Neither the Supreme Court nor any of the courts of appeals have considered this issue.[9] *Moore's Federal Practice* implicitly suggests that the alien permanent resident provision does not alter the requirement of complete diversity for alienage jurisdiction. After discussing cases such as *Faysound v. United Coconut Chemicals* which denied jurisdiction to alienage actions where aliens were present on both sides of the case, *Moore's Federal Practice* suggests:

> It is now clear that the complete diversity rule [for alienage jurisdiction] is merely statutory; the constitution requires only minimal diversity. Thus Congress *could* empower the federal courts to hear the types of cases discussed in this section, despite the fact that aliens are on both sides of the controversy.

> We believe that Congress *should* do so.... *In the absence of Congressional abrogation of the complete diversity rule*, such cases might be accommodated through "pendent parties" jurisdiction.

1 James W. Moore et al., *Moore's Federal Practice* ¶ 0.75[1.–2–3], at 800.41–.42 (2d ed. 1991) (footnotes omitted and emphasis added) (the discussion above was written after the 1988 amendment). *Moore's Federal Practice* correctly indicates that Congress *could* constitutionally abolish the complete diversity requirement for alienage jurisdiction. Nonetheless, the rest of the discussion clearly indicates that, ac-

---

**9.** Although none of the parties in the present case cited any cases which specifically addressed the effect of the alien permanent resident provision on the complete diversity of parties requirement of alienage jurisdiction, this court is aware of one federal district court case in which this issue arose. *Iscar, Ltd. v. Katz*, 743 F.Supp. 339 (D.N.J.1990). The plaintiff in that case was an Israeli corporation and the two defendants were a New Jersey corporation and an Israeli citizen permanently residing in New Jersey. Although the court determined that alienage jurisdiction was proper due to the recent alien permanent resident provision, the court did not engage in any analysis of this issue. The court's opinion focused on whether the court had to dismiss the case because there was no complete diversity at the time the case was filed, and whether the court could dismiss the individual defendant as a dispensable, nondiverse party under Federal Rule of Civil Procedure 21. Because the court in *Iscar* analyzed neither the legislative intent behind the alien permanent resident provision nor the prior case law which it was implicitly modifying, this court is not persuaded by that court's jurisdictional findings.

**1542**

cording to *Moore's Federal Practice*, Congress has not done so.

III. *Application Of The Alien Permanent Resident Provision To The Present Case*

The present case involves two Japanese plaintiffs, a Hawaiian defendant, and two defendants, Tachibana and Masuda, who are Japanese citizens permanently residing in Hawaii. Pursuant to the plain language of the alien permanent resident provision of the federal diversity jurisdiction statute, plaintiffs contend that Tachibana and Masuda should be "deemed" citizens of Hawaii for the purpose of determining complete diversity of the parties. If Tachibana and Masuda are deemed to be Hawaii citizens, complete diversity would exist because there would be two alien plaintiffs versus three defendant "citizens" of Hawaii. Defendants, on the other hand, assert that Congress did not intend to abrogate the established rule that alienage jurisdiction does not encompass cases with both alien plaintiffs and alien defendants.

The present case avoids the aforementioned, potentially unconstitutional applications of the amended version of the federal diversity jurisdiction statute because defendant HISC is a Hawaii corporation. Therefore, this court need not rule on the constitutionality of the alien permanent resident provision. Nonetheless, the question remains whether this court should interpret the statute in a manner which would likely make the statute unconstitutional in other contexts.

■ Under general principles of statutory construction, a court should interpret a statute according to the "plain language" of the statute. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). This general rule, however, is subject to other principles of statutory interpretation which the court will address.

■ First, the language of the statute is not conclusive if there is a "clearly expressed legislative intention to the contrary." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). When interpreting a federal statute, a court's objective is "to ascertain the intent of Congress and to give effect to its legislative will." *In re Southwest Aircraft Servs.*, 831 F.2d 848, 849 (9th Cir. 1987), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988) (citing *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975)). In light of possible conflicting interpretations of a statute, a court must " 'find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " *Commissioner of Internal Revenue v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984) (quoting *National Labor Relations Bd. v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part)).

This court believes that the general purpose of the Judicial Improvements Act is best served by an interpretation of the diversity statute which reduces diversity and alienage jurisdiction. The legislative history of the Act is positively clear that the increasing caseload of the federal courts was, and still is, an area of great concern. The legislative history is equally unequivocal that Congress sought to ameliorate the overburdened federal judicial system by reducing, not expanding, diversity and alienage jurisdiction. Although the legislative history on the specific alien permanent resident provision is sparse, all sources indicate that this provision was enacted solely to prohibit alienage jurisdiction in cases involving a citizen of a state against an alien permanently residing in that same state. The court is aware of no evidence that Congress intended the alien permanent resident provision to accomplish any other objectives.

Second, the Supreme Court has reasoned that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary

to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.*, 485 U.S. 568, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *see also Communications Workers of America v. Beck*, 487 U.S. 735, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988); Norman J. Singer, *Sutherland Statutory Construction* § 45.11 (4th ed. 1984 & Supp.1991).[10] Although the plaintiffs' interpretation of the alien permanent resident provision would not be unconstitutional in the present case, their "plain language" interpretation would be unconstitutional in other obvious contexts. Thus, the court is persuaded that a narrow construction of the alien permanent resident provision is the better reasoned approach.

 Finally, "a change in the status quo should not be inferred unless Congress has unmistakably indicated a wish to the contrary." *Bush v. Oceans Int'l*, 621 F.2d 207, 211 n. 4 (5th Cir.1980). A court should not infer congressional intent to depart from established precedent in the absence of some clear indication that Congress decided to do so. *Sea–Land Serv. v. United States*, 874 F.2d 169, 172–73 (3rd Cir.1989), *aff'd*, 919 F.2d 888 (1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); Norman J. Singer, *Sutherland Statutory Construction* § 45.12 (4th ed. 1984).

In the present case, the plaintiffs offer no reason why Congress would expand alienage jurisdiction and overrule established federal case law prohibiting alienage jurisdiction in cases with aliens on both sides of the litigation. Moreover, absolutely nothing in the legislative history indicates any congressional intent to alter the state of the law regarding complete diversity for alienage jurisdiction purposes.

## CONCLUSION

Due to the legislative history of section 1332 and the clear intent of Con-

gress to reduce diversity and alienage jurisdiction, this court must dismiss this case for lack of complete diversity of the parties. The court notes, however, that this dismissal will not impose any undue hardship on the plaintiffs since this same case is currently pending in state court. For the reasons stated above, the court GRANTS defendants' motions to dismiss.

IT IS SO ORDERED.

**10.** In *Sutherland Statutory Construction,* the author maintains that "the fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another." *Id.* § 45.11, at 46. The author adds "'a strained construction is not only permissible, but desirable, if it is the only construction that will save constitutionality.'" *Id.*